Scofield, J.,
delivered the opinion of the court:
This suit involves the ownership and value of a certain building in the town of Sitka and Territory of Alaska.
The defendants claim that the building, with the land bn which it stands, was ceded to. them by Bussia, in the Treaty of March 30, 1867 (15 Stat. L., 539). The claimants, on the other hand, contend that the building, although standing on land embraced in the cession, was private property, belonging to the Bussian-American Company, under whom they claim, and, as private property, was excepted from the cessiou by the express terms of the treaty.
Ih this suit the claimants do not seek to recover the land, although it is embraced in their deed. They claim only the value of the building and the rent, amounting to $167,000.
*472 The case came before this court some years ago and was then dismissed for want of jurisdiction. (18 C. Cls. R., 504.)
Thereafter Congress passed the following act:
AN ACT referring to the Court of Claims for adjudication the claims of John H. Kinkead, Samuel Sussman, and Charles.O. Wood.
“ Whereas John H. Kinkead, of Nevada, and Samuel Suss-man, of California, did, on the twenty-eighth day of October, eighteen hundred and sixty-eight, purchase a certain building situate on lot known as number one on the official plat of the town of Sitka, m the Territory of Alaska, from the Eussian-American Company, the owner of said building; and
“Whereas, said building had been declared by the protocol of the transfer of Eussian America to the United States to be private property; and
“ Whereas thereafter the collector of customs of the United States did take from said Kinkead and Sussman a lease of a portion of said building, and entered thereupon; and
“Whereas afterward General Jefferson C. Davis did seize the whole of said building, on the ground that the same was the property of the United States, notwithstanding the commissioners appointed to ascertain private property had certified ■the same to be private property; and
“Whereas afterward said Kinkead and Sussman did present their petition to the United States Court of Claims claiming rent for the said building; and
“ Whereas said court did, on the eleventh day of June, eighteen hundred and eighty-three, dismiss said claim for want of jurisdiction only; and
“Whereas Charles O. Wood, of Ohio, did in like manner purchase a certain other building, situate on lot known as number twenty-four, from said Eussian-American Company, and did in like manner present his petition to the Court of Claims for rent of the same, the same having been in like manner seized for the use of the United States, notwithstanding the same had been certified to be private property; and
“.Whereas said Court of Claims did in like manner dismiss the claim of said Wood, for want of jurisdiction only : Therefore,
“ Beit enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That jurisdiction be, and is hereby, conferred on the Court of Claims to hear the claims of John H. Kinkead and Samuel Sussman andi Charles (). Wood, for the rent and value of certain buildings-in the town of Sitka, in the Territory of Alaska, alleged by them to have been acquired by virtue of purchase from the Eussian-American Company, upon the evidence already filed in said court and such additional legal evidence as may be hereafter presented on either side; and if said court shall find that said *473 parties acquired a valid title to said buildings respectively alleged to have been purchased by them, said court shall award to said parties a fair and reasonable rent for the use of the said buildings ior the time (if any) the same have been occupied by the United States, and also a suitable indemnity for said buildings themselves; and the receipt of such rent and indemnity shall thereafter bar any further claim by said parties for the use of said buildings or for the value thereof; and before receiving the same all of said parties shall execute a release to the United States for all right, title, and interest whatsoever in and to the said property; and any defence, set-off, or counter claim may be pleaded by the United States as defendants, as in cases within the general jurisdiction of the court, and either party shall have the same right of appeal as in such cases.
“Approved, January 17, 1887.’’
August 7, 1867, commissioners to make the formal transfer of the Territory, as required by article 4 of the treaty, were appointed and they made their official joint report, or protocol, ' dated at Sitka, October 26,1867. Accompanying this protocol was a schedule in which this building is classed as private property and described as warehouse No. 1. No owner is named.
Subsequently to these proceedings, to wit, October 28,1868, the claimant took from the Russian-American Company a deed of the land on which this building was standing, and paid therefor $3,000 in gold, but the company did not warrant their title. At that time the United States were occupying the northern part of the building as a custom warehouse.
The building was erected by the Russian-American Company in 1845, and from that time until after the transfer to -the United States by the treaty was occupied by that company. They used it for storing furs and other property and for the purpose of general trade. What agreement for the occupancy of the land that company had with the Russian Government does not fully appear. The United States commissioner, in his separate report to the State Department, says:
“ The town of New Archangel (Sitka) was built in the main by the Russian-American Company, and, except the dwellings transferred by them to their employes and the public buildings transferred to the United States, is owned by that company still. Yet it has but a possessory interest in the land, as it only had permission to erect buildings upon it; for, although it had authority to vest the title of lands in its employés, it had no power to vest such title in itself.' The commissioners left *474 the matter as they found it, and the company in possession of its buildings. * * *
“All the buildings in anywise useful for public purposes were delivered to the United States commissioner, taken possession of, and turned over to G-eneral Davis, as were also the .public archives of the Territory ; and in a spirit of liberality the wharf and several valuable warehouses belonging to the Russian-American Company were included in the transfer by the Russian commissioner. Both the wharf and the warehouses were very much needed by our people.”
To decide upon the ownership of the building we must look first to the treaty itself.
By the first article the Emperor of Russia agreed to cede to the United States “ all the territory and dominion now possessed by His Majesty on the continent of America.” It is admitted by the claimants that the land upon which the building stands belongs to His Majesty and constituted a part of the territory thus ceded. That being so, and nothing more appearing, the building would be included in the cession. Confirmatory of this intention of the contracting parties the last lines of the sixth article repeat that “ the cession hereby made conveys all the rights, franchises, and privileges now belonging to Russia in the said territory or dominion, and appurtenances thereto.”
The second article provides that “ in the cession of territory and dominion made by the preceding article are included the right of property in all public lots and squares, vacant lands, and all public buildings, fortifications, barracks, and other edifices, which are not private individual property.”
Taking this article to be a limitation upon the general terms of the first, and admitting that this building would be included in the words “ other edifices,” it becomes necessary to inquire whether it was “ private individual property ” within the meaning of this article.
On the one side it is contended that all edifices not used for governmental purposes are excluded from the cession, and on the other, that no edifice is excluded unless it was not only private property, but property owned by an individual as distinguished from a company.
By the claimants’ construction, the word “individual” has either no meaning at all or is simply a repetition, in meaning, of the preceding word “ private.” We can not suppose that *475 the word was used by the distinguished negotiators without a proper consideration of its normal meaning, nor that it found a place in the text by mere accident, especially as the same words are repeated in the sixth article. We infer, therefore, that “ the high contracting parties ” did not intend to class this edifice as “ private individual property.”
The sixth article seems even more clearly to support the contention of the defendants. It declares that “ the cession of territory and dominion herein made is hereby declared to be free and unincumbered by any reservations, privileges, franchises, grants, or possessions by any associated companies, whether corporate or incorporate, Russian, or any other, or by any parties, except merely private individual property holders.” Here is a guaranty against any claim that “ any associated companies” may set up. Having thus extinguished all claims of the Russian or other companies, the article goes still further and cuts off claims of “ any parties except merely private individual property holders.” So far as this article is concerned, it is not important to inquire whether or not property held by the Russian-American Company can be classed as “ private individual property,” because the excepiion relates only to the • words “ any parties ” in the foregoing enumeration.
To understand fully the purpose of this article, the relation existing between the company and the Russian Government should not be overlooked. That company not only had a monopoly of trade and all sources of wealth in the whole of that vast territory, but exercised over it all the powers of government. The counsel for the claimants, in his-* written brief, says:
“Not only was the American company authorized to administer the government in its own way, but it possessed the power of subletting or transferring its franchises and privileges to other parties, and had exercised that authority.”
While the company could and did convey land to private individuals, its employés and others, it had for itself only the right of occupancy for the purpose of trade. At best it was only a tenant at will. All betterments and buildings placed upon the land became part of the realty, and its ownership and right of occupancy of them ceased with the termination of its tenancy. Russia was about to terminate thn tenancy by transferring the territory to the United States. The company may *476 have had some equities as against Russia, and the United States did not propose to assume them. They were willing that any party who had acquired title to land should retain it, but they did not intend' that these companies should continue to occupy the ceded territory, nor did they intend to pay them for betterments.
To avoid all misunderstanding on that subject and all misconstruction of the first and second articles, the sixth article, after some further negotiation, was inserted. Its language is positive, clear, and unmistakable. All incumbrances, whether originating in grant, privilege, or possession, in favor of these companies are entirely extinguished. Under that article these companies can no more claim buildings put upon the land for the purpose of carrying on trade during their tenancy than they can the land itself. Indeed, it is difficult to see how they could claim or enjoy the buildings without the land. The claimant’s construction of the treaty gives this article no force whatever. In their view of the case it is quite unimportant.
Secretary Seward did not so regard it. He made its adoption an ultimatum. He wanted no controversy with these companies about equities arising from possession and improvement or alleged privileges. He therefore insisted that Russia should clear the territory of all such incumbrances. He even agreed to pay $200,000 to enable Russia to settle, if she saw fit, with her own outgoing tenants. This was in addition to the sum originally agreed to be paid, as appears by the following correspondence:
“Department oe State,
“ Washington, March 23,1867.
“Sir: With reference to the proposed convention between our respective Governments for a cession by Russia of her American territory to the United States, 1 have the honor to acquaint you that I must insist upon that clause in the sixth article of the draught which declares thecession to be free andnn-incumbered by any reservations, privileges, franchises, grants, or possessions by any associated companies, whether corporate or incorporate, Russian or any other, etc., and must regard it as an ultimatum; with the President’s approval, however, I will add two hundred thousand dollars to the consideration money on that account.
“I avail myself of this occasion to offer to you a renewed assurance of my most distinguished consideration.
“William H. Seward,
“ Secretary of State..
“ Mr, Edward de Stoeckl, etc.”
*477 [Translation.]
“Imperial Legation oe Russia
“to the United States,
“ Washington, March 25,1867.
“Mr. Seoretaiíy oe State: I have had the honor to receive the note which you were pleased to address to me on the 23d March, 1867, to inform me that the Federal Government insists that the clause inserted in article sixth of the project of convention must be strictly maintained, and that the territory to be ceded to the United States must be free from any arrangement and privileges conceded either by Government or by companies.
“In answer, I believe myself authorized, Mr. Secretary of State, to accede literally to this request on the conditions indicated in your note.
“Please accept, Mr. Secretary of State, the assurances of my very high consideration.
“Stoeoicl.
“Hon. William: H. Seward,
“ Secretary of State of the United States.”
The opinion of the Attorney-General (14 Ops. Att. Gen., 302), cited by the claimants, can hardly be said to sustain their contention. After discussing the case at considerable length, the opinion concludes as follows:'
“But though the ownership of the buildings in dispute was left by the provisions of the treaty in the Russian-American Company, yet, as all right or interest which the company had in the land on which they were erected was extinguished, and the title thereto transferred, free and unincumbered, to the United States, the company could not by reason of its ownership of those buildings thereafter occupy such land except by the sufferance of the Government of the United States •, and the parties who may have since purchased the buildings from the company would seem to stand in the same situation ¡ elatively to the Government. They are simply occupants of the public domain without title, and where there is no law providing for the acquisition of title from the United States.”
Even according to this opinion the Government had only to take possession and assert its paramount right to make its title complete under the treaty. This the United States had already done by taking possession of the northern part of the building and using it as a custom-house for four months at least before the date of the claimant’s deed. This occupancy was notice to the claimants that the Government was claiming title.
*478 We come now to inquire whether property acquired by the United States under the terms of the treaty has been lost by the action of the commissioners or any branch of the executive department.
The fourth article of the treaty is as follows:
“ His Majesty the Emperor of all the Eussias shall appoint,, with convenient dispatch, an agent or agents for the purpose of formally delivering to a similar agent or agents appointed on behalf of the United States the territory, dominion, property, dependencies, and appurtenances which are ceded as above, and for doing any other act which may be necessary in- regard thereto. But the cession, with the right of immediate possession, is nevertheless to be deemed complete and absolute on the exchange of ratification, without waiting for such formal delivery.”
By this article the commissioners are merely empowered to make a formal delivery of “the territory, dominion, property, and appurtenances which are ceded as above,” but not to enlarge nor diminish the cession. They had no more power to take from or add to the treaty than they had to annul it altogether. They were to go through a public traditional ceremony and make a symbolical delivery. Their duty was altogether formal.
The added words “ and for doing any other act which may be necessary in regard thereto” did not authorize them to put a construction upon the language of the treaty binding upon the parties. “Thereto” refers to the formal delivery and nothing more. That the duty imposed upon them was merely ministerial and in no sense judicial is shown by the concluding words, of the-article, that “the cession, with the right of immediate possession, is nevertheless to be deemed complete and absolute on the exchange of ratification without, waiting for such formal delivery.” Nor did the note of-Secretary Seward, dated January 24,1,868, addressed to General Eosseau, upon the receipt ofihis report and the protocol of the commissioners, commit the Government to their construction of the treaty, if they had attempted to make one. It was merely a complimentary acknowledgment of his services* and not intended to iudorse-any error» into-which he might have fallen;
But the commissioners in fact decided nothing. They simply placed warehouse No. 1 in a-list of buildings; “the owners-thereof,” so-they reported, “have no title-in fee to the land on which they are situated.” They did not undertake to deeide *479 on the question of ownership under the treaty, and therefore gave no certificates to the alleged owners. “ They left the matter as they found it and the company in possession of its buildings.”
They state the facts substantially as the court has found them. The company had erected this building and were occupying it when the commissioners arrived, and they were left in possession when they departed. Whether the building should go with the land or the land with the building was a-question which they left unsettled.
From these facts no question of estoppel can arise. The commissioners decided nothing adverse to the Government, and the Government has never released, even in appearance, any rights acquired by the treaty, but, on the contrary has steadily asserted them.
The instructions to the Commissioners and their action are significant; of the intention of all parties concerned not then to decide nor express an opinion upon the title to private, property affixed to the land ceded to the United States by the-treaty. The commissioners were instructed to distinguish between the property to be transferred to the United States and that to be retained by individuals and to draw up inventories thereof, and were to decide upon the ownership and “ furnish the'said proprietors with a certificate of their right to hold the same.” This they did, and included all such property in Schedule C and gave certificates to theindividual proprietors. Schedule D, in which the warehouse in question is included, was not required by the instructions. The reputed owners were not named and no certificates of ownership were given. It seems., to be a schedule of private property which they found on Government land, the title to which they passed no opinion upon.
The present claimants set up no title under certificates of the-, commissioners.
It remains to be considered, upon the construction of the. law under which this suit is brought: How much of the case-has been decided by Congress, and how.much has been left to the decision of the court l
The preamble recites that—
“ Whereas John H. Kinkead, of Nevada, and Samuel Suss: man, of California, did, on the twenty-eighth day of October, eighteen hundred and sixty-eight, purchase a certain building- *480 situate on lot known as number one on the official plat of the town of Sitka, in the Territory of Alaska, from the Russian-American Company, the owner of said building; and
“Whereas said building had been declared by thepi'otocol of the transfer of Russian America to the United States to be private property; * *
The body of the act provides as follows:
“That jurisdiction be, and is hereby, conferred on the Court of Claims to hear the claims of John H. Kinkead and Samuel Sussman and Charles O. Wood, for the rent and value of certain buildings in the town of Sitka, in the Territory of Alaska, alleged by them to have been acquired by virtue of purchase from the Russian-American Company, upon the evidence already filed in said court and such additional legal evidence as may be hereafter presented on either side; and if said court shall find that said parties acquired a valid title to said buildings respectively alleged to have been purchased by them, said court shall award to said parties a fair and reasonable rent for the use of said buildings for the time (if any) the same have been occupied by the United States, and also a suitable indemnity for said buildings themselves. * * * ”
The claimant contends that Congress has here decided that the legal title to the building, at the time of its purchase, was still vested in the Russian-American Company, and that the court has only to pass upon the sufficiency of the conveyance from this company to themselves before proceeding to ascertain values.
As bearing upon this contention it may be proper to observe that the only question which has ever been in controversy between the parties was whether the title to the building vested in the defendants by the treaty or remained in the company, That the company owned it before the ratification of the treaty, subject to Russian supremacy, has not been denied by the defendants. Uo questions even about the value or rent of the building were discussed prior to the original suit. Through the lease to Collector Ketchum the claimants had substautially made a proposition to rent or sell; but the Secretary of the Treasury refused to consider because he claimed, as did the Secretary of War, that the Government had acquired title to the building by the treaty. If the question of ownership had been out of the case there is no reason to believe that an agreement for rent might not have been amicably effected, as in other cases.
*481 It is scarcely probable that Congress intended by these five words in the preamble, somewhat parenthetically inserted, to decide the only disputed point in the case. We are therefore induced to believe that the recital of ownership referred rather to the date of the treaty than to the date of the claimant’s deed. (Cummings’s Case, 131 U. S. R.)
However that may be, ibis quite certain the court is required to consider values only after it has found that the claimants had acquired a valid title. This, in the opinion of the court, overrules the recital of the preamble, whatever construction may otherwise be placed upon it.
The petition is dismissed.