**Fritz KYER**

*v.*

**The UNITED STATES.**

No. 326–64.

United States Court of Claims.

Dec. 16, 1966.

Warren E. Magee, Washington, D. C., for plaintiff; L. Kenneth Say, Fresno, Cal., attorney of record. Lucius Powers, Jr., and Lawrence Kennedy, Fresno, Cal., of counsel.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

## ON DEFENDANT'S MOTION TO DISMISS THE PETITION

COLLINS, Judge.*

This is a suit for breach of contract in which recovery is sought for a brokerage commission allegedly due plaintiff for services rendered to an agency of the United States, established and controlled

---

* This opinion takes into consideration the Memorandum Report filed by Commissioner George Willi on December 17, 1965.

by the Secretary of Agriculture pursuant to authority vested in him by the Agricultural Marketing Agreement Act of 1937.[1]

Plaintiff is a broker, licensed to deal in alcohol, wines, and various other distilled spirits. In 1962, he entered into a sales commission contract with the Grape Crush Administrative Committee (hereinafter the "Committee"). Under the terms of the contract, plaintiff was to secure a purchaser for a quantity of industrial alcohol that had been made from surplus grapes and, in consideration therefor, he was to receive a 1-cent-per-gallon commission. It is alleged that a purchaser was located and a sale consummated, but that demand for the commission was refused.

Plaintiff's action was initially commenced in a California State Court, whence, upon petition of the United States Attorney for the Southern District of California, the suit was removed to the appropriate United States district court. Removal was predicated upon 28 U.S.C. § 1442(a) (1) which provides, in pertinent part, for the removal of any civil or criminal action, involving, among others, a suit commenced against any agency of the United States.

Upon removal of the action to the district court, plaintiff was confronted with a motion to dismiss. In a supporting memorandum, the United States Attorney urged that the Committee, as an " * * * integral part of the Department of Agriculture and of the United States * * *," could not be sued eo nomine because Congress had not consented to suit against it. See, e. g., Blackmar v. Guerre, 342 U.S. 512, 72 S.Ct. 410, 96 L.Ed. 534 (1952). It was further contended that suit did not lie against the individual Committee members, named as "John Does," for two reasons. First, it was said that Fed.R.Civ. P. 17 did not authorize suit against "fictitious defendants" and, second, that, under a regulation promulgated by the Secretary, the Committee members were immunized from personal liability on account of any acts of omission or commission within the scope of their Committee work.[2] Plaintiff's suit was dismissed, with prejudice, for failure to state a claim upon which relief could be granted. Kyer v. Grape Crush Administrative Comm., Civil No. 2508—ND, S.D.Cal., Order of October 12, 1964. In this present action, plaintiff is again faced with a motion to dismiss.

The Agricultural Marketing Agreement Act of 1937 sought, as its fundamental objective, to effect an orderly exchange of commodities in interstate commerce in order to protect both the interest of the consumer and the purchasing power of the farmer. This goal was to be effected through a series of measures with the authority for their implementation residing in the Secretary of Agriculture (hereinafter the "Secretary"). Among the devices selected was the so-called marketing order.[3] Its general purpose was to establish and maintain such marketing conditions for vari-

1. Chapter 296, 50 Stat. 246, as amended, 7 U.S.C. §§ 601–624 (1964). The act was adopted as a partial reenactment and amendment of the Agricultural Adjustment Act of 1933, ch. 25, 48 Stat. 31, as amended. The legislation followed as an aftermath of the decision in United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477 (1936), which held certain sections of the 1933 act unconstitutional.

2. Under the act of 1933, ch. 25, § 10(c), (d), 48 Stat. 37, the Secretary of Agriculture was authorized to implement regulations to carry out the duties entrusted to him. This regulatory power was retained in the reenactment of 1937. The regulations applicable here appear in 7 C.F.R. §§ 990.1–.402 (1964). Section 990.76 of these regulations states:

"No member or alternate member of the committee or board, nor any employee, representative, or agent of the committee shall be held personally responsible, either individually, or jointly with others, in any way whatsoever, to any person, for errors in judgment, mistakes, or other acts, either of commission or omission, as such member, alternate member, employee, representative, or agent, except for acts of dishonesty."

3. 7 U.S.C. § 608c (1964).

ous agricultural commodities, including grapes, as would provide, in the interest of producers and consumers, a controlled flow of such commodities to market during their normal seasons in order to avoid unreasonable fluctuation in supplies and prices.[4]

Congress provided legislative standards for the issuance, composition, and administration of the marketing orders. Thus, it designated the "handlers" (processors or distributors)[5] as the focal point of the regulatory aspects of the enumerated agricultural commodities[6] as to which orders could be issued. It charged the Secretary with the responsibility for determining whether, applying stated criteria, a marketing order should be issued[7] and prescribed various functional features that were to be included in such orders as were issued.[8] Among such features was one incorporated in the marketing order here involved; that of:

> Determining, or providing methods for determining, the existence and extent of the surplus of any such commodity or product, or of any grade, size, or quality thereof, and providing for the control and disposition of such surplus, and for equalizing the burden of such surplus elimination or control among the producers and handlers thereof.[9]

Implementation of the marketing orders was to be achieved through appointment, by the Secretary, of localized agencies such as the Grape Crush Administrative Committee.[10] The Secretary's power under the act included the authority to issue regulations governing the activities of such agencies. Among the duties thus delegated to the Grape Crush Administrative Committee were the following: For each crop year, the Committee was responsible for recommending to the Sec-

retary the quantity of grapes that might be freely sold without marketing restrictions.[11] If approved by the Secretary, this recommendation became controlling as to the area covered by the order.[12] In those instances where actual production of grapes exceeded the quantity that the Secretary had determined might be freely sold, the order required that the excess be converted by the handlers into spirituous grape products of a type approved by the Secretary. The order denominated such products as "setaside."[13] In the present case, the setaside was the industrial alcohol that plaintiff alleges he was authorized to sell for a specified commission.

In pressing his claim here, plaintiff urges its enforceability against the United States on the sole ground that the Committee was an agency thereof and was duly authorized to enter into the contract in issue. Thus, from plaintiff's standpoint, the agency relation establishes the dispositive factor. In response, defendant affirms the Committee's status as an agency of the United State, but rests the disavowal of liability on two grounds: First, that the Committee's authority was limited in scope and specifically did not encompass the right to incur the expenses here sought; and, secondly, that defendant was immune from suit, the Committee being a nonappropriated fund instrumentality.

We hold that, despite compelling equities in his favor, plaintiff's claim cannot be vindicated in this court. Our reasons, independent of any arguments advanced by either party, are the following:

■ The jurisdiction of this court under the Tucker Act[14] encompasses "any claim against the United States: * * * founded * * * upon any express or implied contract with the United

---

4. 7 U.S.C. § 602(4) (1964).

5. 7 U.S.C. § 608c(1) (1964).

6. 7 U.S.C. § 608c(2) (1964).

7. 7 U.S.C. § 608c(3)–(4) (1964).

8. 7 U.S.C. § 608c(6)–(7) (1964).

9. 7 U.S.C. § 608c(6) (D) (1964).

10. 7 U.S.C. § 608c(7) (C) (1964).

11. 7 C.F.R. §§ 990.47, 990.53 (1964).

12. 7 C.F.R. § 990.48 (1964).

13. 7 C.F.R. § 990.54 (1964).

14. 28 U.S.C. § 1491 (1964).

States; \* \* \*." While the terms of this statute are broad, its words must be read in conjunction with and must be regarded as limited by another statute which provides that our judgments are paid only from appropriated funds.[15] Thus, to remain within the framework of our jurisdiction, it is essential that the contract sued on be one which could have been satisfied out of appropriated funds. It is not enough to say, as plaintiff does, that his contract was one to which the United States was a party. To be actionable *in this court,* that contract must be one which, in the contemplation of Congress, could obligate public monies. G. L. Christian & Associates v. United States, 312 F.2d 418, 425, 160 Ct.Cl. 1, 14, cert. denied, 375 U.S. 954, 84 S.Ct. 444, 11 L. Ed.2d 314 (1963). If Congress has indicated that public funds shall not be involved, we cannot grant the relief requested. And that such is the case here seems to us quite clear.

The Committee with whom plaintiff contracted was neither supported by appropriations nor authorized, in any manner, to obligate such funds. Its financial support derived from two sources— handlers and producers. The former sustained the Committee's general expenses and the latter bore the costs involved in surplus disposals. This self-funding scheme is one that was created by Congress; the applicable statute, 7 U.S.C. § 610(b) (2) (ii), provides:

> Each order relating to any other commodity or product issued by the Secretary under this chapter shall provide that *each handler subject thereto shall pay to any authority or agency established under such order such handler's pro rata share (as approved by the Secretary) of such expenses as the Secretary may find are reasonable and are likely to be incurred by such authority or agency, during any period specified by him, for such purposes as*

*the Secretary may, pursuant to such order, determine to be appropriate, and for the maintenance and functioning of such authority or agency,* other than expenses incurred in receiving, handling, holding, or disposing of any quantity of a commodity received, handled, held, or disposed of by such authority or agency for the benefit or account of persons other than handlers subject to such order. *The pro rata share of the expenses payable by a cooperative association of producers shall be computed on the basis of the quantity of the agricultural commodity or product thereof covered by such order which is distributed, processed, or shipped by such cooperative association of producers.* The payment of assessments for the maintenance and functioning of such authority or agency, as provided for herein, may be required under a marketing agreement or marketing order throughout the period the marketing agreement or order is in effect and irrespective of whether particular provisions thereof are suspended or become inoperative. (Emphasis supplied.)

Within the limits of the foregoing statute, we can perceive no basis for inferring that public funds might be used to pay the commission which plaintiff was allegedly promised. Rather, the statute directly reflects the congressional aim of "equalizing the burden of \* \* surplus elimination \* \* \* among the producers and handlers \* \* \*." [16]

Nor are we persuaded otherwise by the fact that Congress did provide certain appropriations, which might be construed as sufficiently broad in purpose to cover the expenses here sought. We refer here to the appropriations provided under 7 U.S.C. § 612c. Among the designated end uses for the sums allocated under this statute was the following: "(2) encourage the domestic con-

---

15. 28 U.S.C. § 2517 (1964) states, in part: "(a) Every final judgment rendered by the Court of Claims against the United States shall be paid out of any general appropriation therefor, on presentation to

the General Accounting Office of a certification of the judgment by the clerk and chief judge of the court."

16. 7 U.S.C. § 608c(6) (D) (1964).

sumption of such commodities or products by diverting them, by the payment of benefits or indemnities or by other means, from the normal channels of trade and commerce * * *." Even if one were to say that the Secretary had authority under this statute to support the Committee through appropriated monies (rather than through the self-funding scheme which Congress primarily contemplated), plaintiff's standing here would not be altered. As the statute itself makes clear, the Secretary's authority under such circumstances would be totally discretionary—his decision not to implement his assigned duties through the use of appropriated monies would transgress no congressional mandate.[17] Under such circumstances, the absence of appropriated funds, through the result of executive discretion, remains consonant with the views of Congress and is therefore binding upon us in the same manner. In short, whether we regard it as the product of authorized executive discretion or a direct congressional expression, public funds were not made available to the Committee nor was the Committee in any sense authorized to obligate such funds. Therefore, the contract can not now be satisfied from an appropriated source.

▇▇ The fact that the Secretary currently holds a purse out of which plaintiff's claim may possibly be satisfied cannot aid him here.[18] Since we cannot order the Secretary to pay out this money (in this case derived from private sources), we cannot undertake consideration of the claim. Both the lack of appropriation and our lack of jurisdiction with respect to the Secretary compel us to hold that relief cannot be found in this court.

We are mindful of the fact that the result reached spells an unduly harsh outcome. Plaintiff has searched in vain for a forum in which the merits of his claim might be aired. We add, though perhaps of little comfort, that the lack of jurisdiction which plaintiff has faced at every turn is a matter which sorely needs congressional correction.

For the reasons stated, defendant's motion to dismiss is granted, and plaintiff's petition is dismissed.

---

17. 7 U.S.C. § 612c states that the appropriations made available to the Secretary "shall be expended * * * in such manner, and in such amounts as the Secretary of Agriculture finds will effectuate substantial accomplishment of any one or more of the purposes of this section." There has been no showing in this case that the Secretary ever relied upon this section to support any of the Committee's functions. Rather, both plaintiff and defendant concur that the sole sources of Committee funds were those which derived from handler and producer assessments.

18. In December 1964, the Grape Crush Administrative Committee was terminated as provided by law. 7 U.S.C. § 608c(16) (1964). Pursuant to the authority vested in him with respect to the affairs of such agencies, the Secretary of Agriculture assumed custody of the Committee's books and records and responsibility for its orderly liquidation, including the final distribution of its funds. In this connection, the Secretary noted the pendency of the instant suit in this court and directed that a contingency fund of $135,000 be retained in order to meet any judgment that the plaintiff might obtain. The Secretary stipulated that the Department of Agriculture would distribute to eligible producers such portion of the contingency funds as remained after final disposition of the plaintiff's contract claim.