**FURASH & COMPANY,**
**Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 00–5084.**

United States Court of Appeals,
Federal Circuit.

June 13, 2001.

Jed Lloyd Babbin, Tighe, Patton & Babbin, PLLC, of Washington, DC, argued for plaintiff-appellant. With him on the brief was Sharon L. Babbin.

Armando O. Bonilla, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were David M. Cohen, Director; and Bryant G. Snee, Assistant Director. Of counsel on the brief was John C. Mantini, Senior Attorney Advisor, Office of General Counsel, Federal Housing Finance Board, of Washington, DC.

Before MAYER, Chief Judge, RADER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

Furash & Company appeals the decision of the United States Court of Federal Claims dismissing its contract suit against the United States for lack of jurisdiction. *Furash & Co. v. United States,* 46 Fed. Cl. 518 (2000). Because we conclude that the non-appropriated funds doctrine bars the Court of Federal Claims from exercising jurisdiction in this case, we affirm.

I

In 1997, Furash entered into a contract with the Federal Housing Finance Board ("Finance Board"). Under the contract, Furash was to provide consulting services directed toward assessing the value that federal home loan banks perceive in belonging to the federal home loan bank system, which the Finance Board administers. After a dispute developed over Furash's timely completion of its report, the Finance Board terminated the contract for default.

Furash then filed suit against the United States in the Court of Federal Claims, seeking to have the default termination converted to a termination for the convenience of the government. In addition, Furash contended that it was entitled to retain progress payments previously made and to be paid for additional work performed at the Finance Board's direction. The government moved to dismiss Furash's complaint on the ground that the Finance Board is a non-appropriated funds instrumentality ("NAFI") and that the Court of Federal Claims lacks jurisdiction over claims arising from contracts entered into by the Finance Board. The court agreed and dismissed the action, holding that the non-appropriated funds doctrine precluded the court from exercising jurisdiction under either the Tucker Act, 28 U.S.C. § 1491, or the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 ("CDA"). This appeal followed.

II

Furash argues that the trial court erred when it concluded that the non-appropriated funds doctrine bars the court from exercising jurisdiction under the Tucker Act. Through the Tucker Act, Congress waived the federal government's sovereign immunity and defined the jurisdiction of the Court of Federal Claims with respect to claims "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491; *see United States v. Mitch-*

*ell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

The jurisdictional grant in the Tucker Act is limited by the requirement that judgments awarded by the Court of Federal Claims must be paid out of appropriated funds. 28 U.S.C. § 2517. Based on that requirement, it has been held that absent some specific jurisdictional provision to the contrary the Court of Federal Claims lacks jurisdiction over actions in which appropriated funds cannot be used to pay any resulting judgment. *See L'Enfant Plaza Props., Inc. v. United States,* 229 Ct.Cl. 278, 668 F.2d 1211 (Ct.Cl.1982); *Kyer v. United States,* 177 Ct.Cl. 747, 369 F.2d 714 (1966); *see also United States v. Hopkins,* 427 U.S. 123, 125–26, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976) (recognizing the jurisdictional limitation for non-appropriated fund instrumentalities, but holding that disputes over contracts with military exchanges could be adjudicated by the Court of Claims because of a specific grant of jurisdiction).

Congress addressed the non-appropriated funds doctrine in 1970, when proposals were made to abolish the doctrine by legislation. Rather than abolish the doctrine altogether, however, Congress chose to create a narrow exemption from the doctrine for certain entities, the military post exchanges and the exchange councils of the National Aeronautics and Space Administration. *See McDonald's Corp. v. United States,* 926 F.2d 1126, 1129–33 (Fed.Cir.1991). Accordingly, Congress amended the Tucker Act and the "judgment fund" statute, 31 U.S.C. § 1304, to give the Court of Federal Claims jurisdiction over actions against those non-appropriated fund instrumentalities. Pub.L. 91–350, 84 Stat. 449 (1970). The legislative history of the 1970 Act makes clear that Congress intended to leave the doctrine intact for all other non-appropriated fund instrumentalities unrelated to the post ex-

changes and exchange councils. *See McDonald's Corp.,* 926 F.2d at 1132–33; *Swiff–Train Co. v. United States,* 443 F.2d 1140, 1142–43 (5th Cir.1971). As explained in the House report on the legislation,

> complete removal of sovereign immunity for *all* nonappropriated fund activities would be undesirable.... Clearly, Congress ought not to expose the Federal Government to liability for *all* nonappropriated fund activities unless [data regarding potential liability] is assembled. Under the [bill as enacted] the sovereign immunity of the United States would be removed only with respect to the post exchange types of operations which are conducted within the Defense Department and the National Aeronautics and Space Administration.

H.R.Rep. No. 91–933 (1970), *reprinted in* 1970 U.S.C.C.A.N. 3477, 3478–79.

In applying the non-appropriated funds doctrine, this court has held that the Court of Federal Claims must exercise jurisdiction absent a clear expression by Congress that it intended to separate the agency from general federal revenues. *See L'Enfant Plaza,* 668 F.2d at 1212. To establish jurisdiction, the plaintiff need not show that appropriated funds have actually been used for the agency's activities, but only that "under the agency's authorizing legislation Congress could appropriate funds if necessary." *Id.* Thus, the fact that an agency such as the Finance Board has been financially self-sufficient is not dispositive. Instead, "Congress must have intended that the activity resulting in the claim was not to receive or be funded from appropriated funds"; that is, there must be a "firm indication by Congress that it intended to absolve the appropriated funds of the United States from liability for acts" of the agency. *Id.*

We agree with the trial court that there has been a clear expression by

Congress that the Finance Board's operations are to be funded through assessments against federal home loan banks, not from general fund revenues, and that the Court of Federal Claims therefore lacks Tucker Act jurisdiction over this case. The Finance Board's assessment authority is granted at 12 U.S.C. § 1438(b), which provides:

· (1) In general

The Board may impose a semiannual assessment on the Federal Home Loan Banks, the aggregate amount of which is sufficient to provide for the payment of the Board's estimated expenses for the period for which such assessment is made.

(2) Deficiencies .

If, at any time, amounts available from any assessment for any semiannual period are insufficient to cover the expenses of the Board incurred in carrying out the provisions of this chapter during such period, the Board may make an immediate assessment against the Banks to cover the amount of the deficiency for such semiannual period.

(3) Surpluses.

If, at the end of any semiannual period for which an assessment is made, any amount remains from such assessment, such amount will be deducted from the assessment on the Banks by the Board for the following semiannual period.

To be sure, section 1438 does not expressly prohibit congressional appropriation of funds to the Finance Board. The absence of such an express statement in the authorizing statute, however, does not end the inquiry. Under the test set forth in *L'Enfant Plaza*, what matters is whether the agency's authorizing legislation makes clear that Congress intends for the agency—or the particular activity that gave rise to the dispute in question—to be separated from general federal revenues.

*Denkler v. United States*, 782 F.2d 1003 (Fed.Cir.1986), provides an example of an agency that was held to be a non-appropriated funds instrumentality even though its separation from appropriated funds was not made explicit. In that case, the court held the Board of Governors of the Federal Reserve System to be a non-appropriated fund instrumentality after concluding that Congress intended the Board to be self-sufficient and not to use appropriated funds to defray its expenses. Although the Board's authorizing statute contained no express statement that appropriated funds could not be used to support the Board's operations, the court found a "clear expression" to separate the Board from general federal revenues in light of "the combination of designation of assessments on banks as the source of funds for salaries, and the absence of the conventional language authorizing funds to be appropriated." 782 F.2d at 1005. *See also Research Triangle Inst. v. Bd. of Governors of the Fed. Reserve Sys.*, 132 F.3d 985, 988 (4th Cir.1997) (similarly concluding that the Board of Governors of the Federal Reserve System is a non-appropriated fund instrumentality to which Tucker Act jurisdiction does not apply).

The same analysis applies to the closely parallel language in the authorizing legislation for the Finance Board. Section 1438 provides a scheme that includes not only a standard assessment but also an immediate assessment that may be used to make up deficiencies. Absent statutory amendment, there is therefore no situation in which appropriated funds would be used to make up a deficiency. The Finance Board's funds are similarly isolated from general fund revenues in the event that the assessments result in a surplus, as the statute provides that any surplus will be credited to the assessed banks rather than to the general fund of the Treasury.

The scheme set out in section 1438 distinguishes this case from *L'Enfant Plaza*. In that case, the authorizing legislation did not provide a means for the Comptroller of the Currency to make special assessments in response to financial deficiencies, and Congress had periodically financed the Comptroller's operations through appropriation when the funds received by the Comptroller from regulated banks were insufficient to cover expenses. 668 F.2d at 1212. The funding mechanism for the Finance Board is also distinguishable from the funding mechanism at issue in *South Louisiana Grain Services, Inc. v. United States*, 1 Cl.Ct. 281 (Cl.Ct.1982), on which Furash relies. The court in that case held the non-appropriated funds doctrine inapplicable because, although Congress clearly wanted the agency to be as self-supporting as possible, the authorizing legislation recognized that appropriated funds would be needed for the agency to function properly, and provision was made for the authorization of such funds. *Id.* at 287.

█ The conclusion that the non-appropriated funds doctrine applies in this case is further supported by 12 U.S.C. § 1422b(c), which addresses the character of the funds received by the Finance Board:

Receipts of the Board derived from assessments levied upon the Federal Home Loan Banks and from other sources ... shall be deposited in the Treasury of the United States. Salaries of the directors and other employees of the Board and all other expenses thereof may be paid from such assessments or other sources and shall not be construed to be Government Funds or appropriated monies, or subject to apportionment for the purposes of chapter 15 of Title 31, or any other authority.

That statute not only directs that Finance Board funds are to be maintained distinct from general funds even when deposited with the Treasury, but also adds the proviso that the funds are not to be construed as appropriated monies. We do not agree with Furash's argument that the reference to "appropriated monies" means only that the funds used to pay the Board's expenses are not considered appropriated monies for apportionment purposes. Rather, we read the statutory language, particularly in light of the use of a comma and the word "or" before the words "subject to apportionment," to mean that the funds used to pay the Board's expenses are (1) not construed to be government funds or appropriated monies; and (2) not subject to the apportionment rules in chapter 15 of title 31 of the United States Code.

█ Finally, the Finance Board's authorizing statute contains a specific exception to the scheme under which Finance Board expenses are not paid by appropriated funds. In 12 U.S.C. § 1438a, the statute provides that studies or investigations directed by law or requested by Congress "shall be considered as nonadministrative expenses." As the trial court explained, that means that those costs will be paid for from appropriated funds. We agree with the trial court that that statute does not alter the status of the Finance Board as a non-appropriated fund instrumentality. Instead, it confirms that, except with respect to that specific activity, which is not at issue in this case, the Finance Board's expenses are not expected to be defrayed by appropriated funds.

The statutory provisions governing the funding of the Finance Board's operations thus make clear that, with the single narrow exception discussed above, Congress intended the Finance Board to be a financially self-sufficient instrumentality designed to operate without the benefit of general appropriated funds. Accordingly,

the Tucker Act does not give the Court of Federal Claims jurisdiction over this case.

## III

Furash next argues that even if jurisdiction under the Tucker Act is barred by the non-appropriated funds doctrine, the Court of Federal Claims still has jurisdiction under the CDA. The CDA applies "to any express or implied contract (including those of the non-appropriated fund activities described in sections 1346 and 1491 of title 28) entered into by an executive agency for—... (2) the procurement of services." 41 U.S.C. § 602. The parties agree that the Finance Board is an executive agency as defined by the CDA. Accordingly, Furash argues, the Court of Federal Claims has jurisdiction over the dispute in this case even if the Finance Board is a non-appropriated fund instrumentality.

In support of its argument, Furash relies on a passage from this court's decision in *United States v. General Electric Corp.,* 727 F.2d 1567, 1570 (Fed.Cir.1984), in which the court stated that "[n]othing in the Contract Disputes Act of 1978 limits its application to appropriated funds." While it is true that the CDA contains no express provision limiting it to agencies supported by appropriated funds, we do not interpret *General Electric* to mean that the non-appropriated funds doctrine, as developed under the Tucker Act, is inapplicable to cases brought under the CDA. Indeed, immediately following the passage cited by Furash, the court recited the principle, developed in Tucker Act cases, that "[t]he non-appropriated funds doctrine applies only if the activity was 'specifically intended to operate without using appropriated funds.'" *Id.* (quoting *Hughes Aircraft Co. v. United States,* 209 Ct.Cl. 446, 534 F.2d 889, 907 (Ct.Cl.1976)). The court in *General Electric* went on to analyze the case under the conventional non-appropriated funds doctrine, applying

*L'Enfant Plaza* and similar cases, and ultimately concluded that the Claims Court had jurisdiction because "[i]t is clear that [the agencies in question] have authority to use appropriated funds to the extent appropriated, and 'that is sufficient to avoid the non-appropriated funds exclusion.'" *General Electric,* 727 F.2d at 1570 (quoting *McCarthy v. United States,* 229 Ct.Cl. 361, 670 F.2d 996, 1002 (1982)). Accordingly, we interpret *General Electric* to mean that for CDA jurisdiction to be foreclosed, Congress must make clear that the activity in question was intended to operate without appropriated funds, the same standard that is used under the Tucker Act.

That conclusion is consistent with other court and Board of Contract Appeals decisions holding the non-appropriated funds doctrine applicable to CDA cases. *See Research Triangle Inst. v. Bd. of Governors of the Fed. Reserve Sys.,* 132 F.3d 985, 988 & n. 15 (4th Cir.1997); *Wolverine Supply, Inc. v. United States,* 17 Cl.Ct. 190 (1989); *Trent Jones, Inc.,* 99–1 B.C.A. (CCH) ¶ 30,196 (Ag.B.C.A.1998); *Frontlook Promotions, Inc.,* 99–1 B.C.A. (CCH) ¶ 30,175 (A.S.B.C.A.1998); *Computer Valley Int'l, Ltd.,* 94–1 B.C.A. (CCH) ¶ 26,297 (A.S.B.C.A.1993). It is also consistent with the language and legislative history of the CDA itself, which make clear that Congress did not intend for the CDA to obviate the non-appropriated funds doctrine, but instead intended for the CDA to be subject to the principle set forth in 28 U.S.C. § 2517, that unless otherwise provided, all judgments of the Court of Federal Claims are to be paid from appropriated funds.

Section 2517, by its terms, applies to all judgments of the Court of Federal Claims "[e]xcept as provided by the Contract Disputes Act of 1978." In the CDA, as in the Tucker Act, Congress did not create a general exception for non-appropriated

fund instrumentalities, but instead incorporated the language from the Tucker Act that created an exception for the post exchange non-appropriated fund instrumentalities that were the subject of the 1970 Tucker Act amendments. Thus, in 41 U.S.C. § 602, Congress provided that the Act applied to any express or implied contract "including those of the nonappropriated fund activities described in [the Tucker Act]."

The provenance of that limited exception to the non-appropriated funds doctrine strongly supports the government's argument that the doctrine applies in the same fashion to the CDA as it does to the Tucker Act. Furash argues that the purpose of the parenthetical language in section 602 of the CDA was not to identify non-appropriated fund instrumentalities covered by the CDA, but rather to identify non-executive agencies that are so covered. The more natural reading of the text, however, suggests that the parenthetical language was intended to make an exception to the non-appropriated funds limitation and not to the executive agency limitation. The parenthetical language describes the military exchanges as "the nonappropriated fund activities described in [the Tucker Act]," which implies that other non-appropriated fund activities are not included.

 The language of the CDA supports the government's position in another respect as well. The CDA provides that judgments entered under the Act will be paid in accordance with the provisions of 31 U.S.C. § 1304, the "judgment fund" statute. 41 U.S.C. § 612(a). That statute, in turn, provides that the judgment fund can be used to pay judgments arising from contracts with the military exchanges and NASA exchange councils, but that those entities must reimburse the government for the amount paid from the judgment fund. 31 U.S.C. § 1304(c). The CDA has a similar reimbursement provision, but it applies only to "agencies whose appropriations were used for the contract," 41 U.S.C. § 612(c), which would not apply to non-appropriated fund instrumentalities. Thus, under Furash's interpretation of the CDA, reimbursement of the judgment fund would be required of all appropriated fund instrumentalities and those non-appropriated fund instrumentalities specifically identified in the Tucker Act, but not other non-appropriated fund instrumentalities. That result is so anomalous that it seems plain that the CDA was not intended to reach non-appropriated fund instrumentalities other than the military exchanges and the NASA exchange councils.

Any lingering doubt on this score is dispelled by the legislative history of the CDA, which makes clear that Congress did not intend for the CDA to apply to non-appropriated fund instrumentalities except for those specifically identified in the Act. As explained in the Senate report:

> The bill expressly states its applicability to those nonappropriated fund activities over which the courts presently have jurisdiction under 28 U.S.C. 1346 and 1491. Consideration was given to including all nonappropriated fund activities. However, since the court's present jurisdiction over nonappropriated fund contracts is limited to certain post exchanges, and as there appears to be no problem with remedies relating to other nonappropriated fund activities, it was deemed unnecessary to include all or any additional nonappropriated fund activities within the scope of the bill.

S.Rep. No. 95–1118, at 18 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5252. That language is squarely contrary to Furash's position. Based on the language of the statute, as explicated by the legislative history, we regard it as inescapable that Congress was aware of the non-appropriated funds doctrine and that it did not intend

**1344**

for the CDA to expand the court's jurisdiction to reach non-appropriated fund activities other than those specifically identified in the Tucker Act and incorporated by reference in the CDA.

In sum, we agree with the government that the statutes governing the Finance Board's funding make it clear that Congress intended the Finance Board to operate free from appropriated funds. Accordingly, the Court of Federal Claims properly concluded that it lacks jurisdiction under either the Tucker Act or the CDA to adjudicate Furash's claims in this case.

*AFFIRMED.*