**LION RAISINS, INC., a California corporation, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 02–1363 C.**

United States Court of Federal Claims.

Aug. 1, 2003.

**436**

Brian C. Leighton, Clovis, California for the plaintiff.

Christina C. Ashworth, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr.; David M. Cohen, Director; and Donald E. Kinner, Assistant Director, for the defendant.

### OPINION

MEROW, Senior Judge.

Plaintiff, Lion Raisins, Inc., ("Lion") purchases raisins from growers in the Central San Joaquin Valley, California. Lion then processes and sells raisins in the domestic and international markets.

Pursuant to the Agricultural Marketing Agreement Act of 1937 ("AMAA"), 7 U.S.C. § 601 *et seq.*, the Secretary of Agriculture established a marketing order to regulate the handling of raisins produced from grapes grown in California. 7 C.F.R. § 989 *et seq.* The Raisin Administrative Committee ("RAC"), an elected body of forty-seven member representatives and forty-seven alternate members, comprising thirty-five growers and ten handlers from the raisin industry, one public member and one member representing the largest cooperative bargaining association, was created to formulate policy for the raisin industry within the legal framework of the marketing order. *See* 7 C.F.R. §§ 989.26, 989.35, 989.36. The industry nominates and the Secretary of Agriculture appoints members to the RAC. *See* 7 C.F.R. §§ 989.29, 989.30. The RAC possesses oversight responsibility and employs a president and staff who perform the functions necessary to carrying out marketing order policy. 7 C.F.R. § 989.36(g).

As a part of volume control measures, the marketing order established a category of "reserve" tonnage raisins. 7 C.F.R. § 989.66. In its First Amended Complaint, Lion alleges that the RAC provides handlers with RAC owned bins, free of charge, for the storage of reserve raisins. It is also alleged that if the RAC has insufficient bins to handle the reserve tonnage ordered by the Secretary of Agriculture, packers will utilize their own bins, and the RAC agrees to pay the packer $10.00 per bin per year.

RAC receives all its funding from assessments paid by handlers. 7 C.F.R. § 989.79. Expenses incurred from the sale of reserve raisins are reimbursed by reserve profits and the balance distributed to producers. 7 C.F.R. § 989.66. RAC receives no funds appropriated by Congress.

Lion claims that in 2002 it was unable to locate 2,229 bins and asserts that, at that time, RAC possessed a surplus of 2,229 bins. Lion alleges that it determined that the RAC must have Lion's own bins at some other facility and RAC refuses to deliver the 2,229 bins or pay Lion for 2,229 bins at $55.00 per bin.

Asserting that the RAC has taken 2,229 Lion owned bins without paying just compensation, plaintiff seeks recovery of $22,290.00 which equals 2,229 bins multiplied by $10.00 per bin rental charges and in the absence of a replacement of Lion's bins, recovery of an additional $122,595.00 (2,229 bins multiplied by $55.00 per bin) is claimed. Lion also seeks a $15,840.00 refund of RAC bin rentals charged to Lion since the 2000/2001 crop year on the basis that this rental would not have been paid if RAC had delivered to Lion its 2,229 bins.

Defendant responded to plaintiff's First Amended Complaint with a motion to dismiss based upon the status of RAC as a non-appropriated fund instrumentality ("NAFI"). Plaintiff opposes dismissal based upon the nature of its claim as based upon the just compensation clause of the Fifth Amendment to the United States Constitution.

■ Contrary to plaintiff's argument, prior precedent clearly establishes that instrumentalities such as RAC, established pursuant to the AMAA, are NAFIs. *Kyer v. United States*, 177 Ct.Cl. 747, 752–754, 369 F.2d 714, 718–19 (1966), *cert. denied*, 387 U.S. 929, 87 S.Ct. 2050, 18 L.Ed.2d 990 (1967). As a NAFI, not listed in 28 U.S.C. § 1491(a)(1), precedent also establishes that this Court lacks jurisdiction over contract or pay claims, other than Fair Labor Standard Act matters, generated against an instrumentality such as RAC. *United States v. Hopkins*, 427 U.S. 123, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976); *Core Concepts of Florida, Inc. v. United States*, 327 F.3d 1331 (Fed.Cir.2003); *Taylor v. United States*, 303 F.3d 1357 (Fed.Cir.2002). This is because judgments of this Court are paid from appropriated funds and express jurisdictional legislation is required to bring claims against NAFIs, which do not obligate appropriated funds, within this Court's jurisdictional ambit. *Compare El–Sheikh v. United States*, 177 F.3d 1321 (Fed.Cir.1999) (Fair Labor Standards Act expressly included NAFI employees within its scope and granted employees the right to sue for violation of the Act) with *Taylor v. United States*, 303 F.3d at 1361 (Separation Pay Statute involved does not extend expressly to NAFI employees

and, in any event, would not obligate appropriated funds as a source of separation payments).

■ Plaintiff's First Amended Complaint drops the original contract claim orientation for its raisin bin claims and, instead, asserts a Fifth Amendment taking claim. Plaintiff now argues that the Court has jurisdiction to award just compensation for a "taking" of property by a NAFI. Plaintiff relies upon the "self-executing" aspects of the Fifth Amendment with respect to entitlement to just compensation for a taking. *See United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). This feature of the Fifth Amendment does not, however, provide the express grant of jurisdiction to this Court which is required for the entry of a judgment on a claim against a NAFI not listed in 28 U.S.C. § 1491(a)(1). The general language of the Fifth Amendment to the Constitution can not be equated to the listing of specific NAFIs in 28 U.S.C. § 1491(a)(1) or to the express provisions of the Fair Labor Standards Act cited in *El–Sheikh v. United States, supra.*

Without legislation providing jurisdiction to a tribunal to award just compensation for property taken, the Fifth Amendment simply establishes the right to compensation but not the remedy. For example, before the Court of Claims was provided jurisdiction in the Tucker Act, March 3, 1887, c. 359 § 1, 24 Stat. 505, to render judgment on any claim against the United States founded "upon the Constitution" the situation that then existed is described in *The United States Court of Claims, A History, Part II, Origin—Development—Jurisdiction 1855—1978*, published in Vol. 216, Court of *Claims Reports*, at pp. 45–46 as follows:

(f) *Taking Cases*

Plaintiffs, who invoke the fifth amendment's mandate that no private property shall be taken for public use without just compensation, come to the court under its Tucker Act jurisdiction to adjudicate "claims founded upon the Constitution of the United States." This clause was new with the Tucker Act; the court's original establishing act did not confer similar jurisdiction. Were it not for this provision,

of course, the United States was not suable unless it had elsewhere waived its sovereign immunity. Alternative recourse might be available, in theory at least, to property owners who could make out the difficult proof that the Government's assumption of possession of their property constituted the Government's implied-in-fact promise to pay for it, for this could be heard as a contract claim against the United States. But no contract could be implied when the Government held by assertion of its own right. If the assertion were erroneous, this was a tort. *See Langford v. United States, supra,* [101 U.S. 341, 25 L.Ed. 1010 (1879)] and *Kinkead v. United States,* 18 Ct.Cl. 504 (1883). As to the latter claim, the court was afterwards directed to adjudicate the title by special law, Act of January 17, 1887, 24 Stat. 358, and did so, *[Kinkead v. United States,]* 24 Ct.Cl. 459[, 1800 WL 1734] (1889), aff'd, 150 U.S. 483, 14 S.Ct. 172, 37 L.Ed. 1152 (1893). Or, some plaintiffs might in the period covered have succeeded in recovering possession through an action to eject the Government official who occupied the property. *See United States v. Lee,* 106 U.S. 196[, 1 S.Ct. 240, 27 L.Ed. 171] (1883). Most property owners, nevertheless, were left to petition Congress for private relief, but Congress was neither compelled to act, nor to act favorably. Thus, many owners had suffered the misfortune of holding a legal right for which there was no enforceable legal remedy. All this was enough to move the Supreme Court in the *Langford* case to lament, "It is to be regretted that Congress has made no provision by any general law for ascertaining and paying this just compensation." 101 U.S. at 343.

Yet, there the situation stood until 1887, when the Tucker Act created a direct remedy for compensation in the Court Claims.

That the Tucker Act provision for claims founded on the Constitution does not encompass NAFI takings can be seen from the comparable experience with the Tucker Act contract provision. Although the Court of Claims was provided jurisdiction concerning express or implied contracts in the Act of February 24, 1855, c. 122, 10 Stat. 612, which established the Court, to obtain jurisdiction over certain contract claims against NAFIs it was necessary to amend the Court's contract jurisdiction provision in 1970 to provide that "an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States." Pub.L. 91–350, 84 Stat. 449. This was done to afford contractors a federal forum in which to sue the listed NAFIs by doing away with a "loophole" in the Tucker Act. S.Rep. No. 91–268, p. 2 (1969); H.R.Rep. No. 91–933, p. 2 (1970), U.S.Code Cong. & Admin.News 1970, pp. 3477, 3478.

Similarly, if it is concluded that jurisdiction should be provided to this Court for the resolution of claims for the "taking" of property by NAFIs, an equivalent amendment of 28 U.S.C. § 1491(a)(1), addressed to claims founded upon the Constitution provision, would be required. This is a matter for Congress in that "courts should refrain from legislating by judicial fiat." *Keetz v. United States,* 168 Ct.Cl. 205, 207, 1964 WL 8586 (1964).[1]

---

1. Defendant's footnote comment concerning the appropriate forum to address any "constitutional implications" with respect to the absence of a judicial forum to resolve NAFI "takings" claims fails to analyze the nature of this proceeding. As noted, for the period between the adoption of the Constitution on March 4, 1789 and March 3, 1887, there was no judicial tribunal to resolve just compensation takings claims. These matters were the province of Congress under Article I of the Constitution. From 1855 to 1887, such claims could be resolved by the Court of Claims if they could be cast in the mold of implied contract obligations. The Court of Claims as originally created, and for a considerable time thereafter, was considered to be an Article I (legislative) tribunal. See *Glidden v. Zdanok,* 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). The issue involves appropriations, clearly a legislative function. See U.S. CONST. art. I § 9. In short, from the standpoint of the separation of powers, consideration of monetary claims against the government has a legislative genesis and it is entirely appropriate for the resolution of such matters, including constitutional implications, if any, to be assigned to an Article I (legislative) tribunal. *Williams v. United States,* 289 U.S. 553, 581, 53 S.Ct. 751, 77 L.Ed. 1372 (1933).

Accordingly as the RAC is a NAFI not listed in 28 U.S.C. § 1491(a)(1), the Court has no jurisdiction to resolve plaintiff's claims concerning 2,229 raisin bins, whether presented as contract or taking matters. In this circumstance, it is **ORDERED** that defendant's motion to dismiss, filed June 12, 2003, is **GRANTED** and judgment shall be issued **DISMISSING** plaintiff's First Amended Complaint with no costs assessed.