LION RAISINS, INC., et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 01–572C.

United States Court of Federal Claims.

Oct. 28, 2003.

Brian C. Leighton, Clovis, CA, for plaintiff.

Cristina C. Ashworth, U.S. Department of Justice, Washington, DC, with whom were

Peter D. Keisler, Assistant Attorney General, and Director David M. Cohen, for defendant.

## OPINION

FIRESTONE, Judge.

This matter comes before the court on the United States' June 13, 2003 Motion to Dismiss pursuant to rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). On January 3, 2002, plaintiffs Lion Raisins, Inc. and Lion Brothers filed their First Amended Complaint alleging that the United States is liable to them for a taking without just compensation in violation of the Fifth Amendment, in connection with resolutions passed by the Raisin Administrative Committee ("RAC") and approved by the United States Department of Agriculture ("USDA")[1]. The plaintiffs allege that as a result of the resolutions, which approved of the RAC's use of money held in reserve by the RAC to fund export programs under the Agricultural Marketing Agreement Act of 1937 ("AMAA"), the United States accomplished a taking of their share of the RAC reserve money. The government contends that this court is without subject matter jurisdiction to adjudicate the plaintiffs' claim on the ground that the RAC is a non-appropriated fund instrumentality ("NAFI"). For the reasons set forth below, the court **GRANTS** the government's motion to dismiss.

## BACKGROUND

The following facts, upon which the plaintiffs' claims are predicated, are assumed to be true for the purposes of this motion. Plaintiff Lion Raisins, Inc. is a California corporation that markets raisins. The defendant is the United States, which, by the enactment of the AMAA, authorizes the Secretary of Agriculture ("Secretary") to establish marketing orders, which are binding on all individuals and businesses that are classified as handlers in a determined geographic area. 7 U.S.C. § 601 et seq. The objective of these marketing orders includes the "or-

derly exchange of commodities in interstate commerce." *Kyer v. United States,* 177 Ct. Cl. 747, 369 F.2d 714, 716 (1966). Among the marketing orders that the Secretary has established is the Raisin Marketing Order, the purpose of which is to regulate the handling of California raisins. 7 C.F.R. § 989.1 et seq. The Raisin Marketing Order, in turn, establishes the RAC and sets out its powers, duties and obligations. 7 C.F.R. § 989.1 et seq.

The RAC, whose members are appointed by the Secretary after industry nomination, is composed of members of the raisin production industry, including growers, handlers, one public member and one member representing the industry's largest cooperative bargaining association. It employs a president who, along with a staff, performs the functions necessary to carry out the policy set out in the Raisin Marketing Order. The RAC is responsible for establishing its own procedures and the rules and regulations necessary for the operation of its activities, including the raisin export program. 7 C.F.R. § 989.1 et seq. Furthermore, the RAC makes recommendations to the Secretary of Agriculture regarding, *inter alia,* the amount of raisins which should be held in reserve by the RAC, minimum quality standards for the raisin industry, and the budgetary requirements of the RAC, all of which are subject to the Secretary's approval. *See* 7 C.F.R. §§ 989.54; 989.55; 989.56(a); 989.56(e); 989.58; 989.59; 989.79; 989.80. The RAC receives all of its funding from assessments paid by handlers; it receives no funding from Congress. 7 C.F.R. § 989.79.

The AMAA and the Raisin Marketing Order provide the Secretary with the authority to impose volume regulations to promote orderly marketing conditions and stabilize the price of raisins. Under this authority, and in order to accomplish this goal, the RAC designates what percentage of the California raisin crop must be set aside as "reserve tonnage" and what percentage may be designated "free tonnage." While the free tonnage

---

1. In the Plaintiffs' Opposition to Defendant's Motion to Dismiss Plaintiff's [sic] First Amended Complaint, plaintiffs voluntarily dismissed their first cause of action, which alleged a violation of

act of Congress and agency regulations. The remaining takings claim is considered in this opinion.

of raisins may be sold by handlers to any market, the reserve tonnage must be held for the account of the RAC in a reserve pool. These reserve raisins are then sold pursuant to RAC programs. Reserve raisins sold pursuant to RAC programs are sold to markets which do not compete with the free tonnage raisin market; for example, they are used in school lunch programs, by distilleries, as animal feed, or by government purchasers. By changing the percentage of raisins produced that must be kept in reserve, the RAC can regulate the amount of raisins that are competing in the domestic raisin market. By regulating the amount of raisins in this market, the RAC can, in effect, regulate the price at which raisins are sold domestically.

The income generated from the sale of the reserve raisins is distributed back to the equity holders, that is, the growers who originally contributed the raisins to the RAC. Before this equity distribution, however, the RAC decides how much of the income will be used to subsidize the raisin export programs. The raisin export program reimburses handlers who sell their raisins abroad. The handlers receive the difference between the domestic price for raisins and the export price, which is considerably lower than the domestic price.

In 1997, there was a very large crop of raisins and consequently the RAC designated a large portion of the raisins as reserve. This resulted in a large amount of income generated by the sale of these raisins. In 1998 and 1999 the crops were considerably smaller, which resulted in a small amount of income generated by the sale of raisins designated as reserve. Consequently, the RAC resolved to use money generated from the 1997 crop to subsidize the 1998 and 1999 export programs.

The plaintiffs, as equity holders in the 1997 reserve raisin pool, allege that the RAC resolution, to use 1997 cash to subsidize the 1998 and 1999 export programs, was a taking in violation of their Fifth Amendment right to just compensation. The plaintiffs name the United States as defendant for its role, through the USDA, of approving the RAC resolution to use the 1997 income to subsidize the export programs through February 2000.

On June 13, 2003, the United States moved the court to dismiss the case on the grounds that this court lacks subject matter jurisdiction to adjudicate this dispute because any alleged "taking" was caused by the RAC which, as a NAFI, may not be sued in this court. After briefing, oral argument was held on October 20, 2003.

## DISCUSSION

### A. Standard of Review

When ruling on a motion to dismiss for lack of subject matter jurisdiction, this court "must accept as true the facts alleged in the complaint, and must construe such facts in the light most favorable to the pleader." *AINS, Inc. v. United States,* 56 Fed.Cl. 522, 527 (2002) (citing *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995)). Furthermore, in the context of issues arising "under the non-appropriated funds doctrine, the Court of Federal Claims must exercise jurisdiction absent a 'clear expression by Congress that it intended to separate the agency from general federal revenues.'" *Core Concepts of Florida, Inc. v. United States,* 327 F.3d 1331, 1334 (Fed.Cir.2003) (quoting *Furash & Co. v. United States,* 252 F.3d 1336, 1339 (Fed.Cir.2001)). However, "the burden of establishing the court's subject matter jurisdiction rests with the party seeking to invoke it." *Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1377 (Fed.Cir. 1998); *AINS,* 56 Fed.Cl. at 526–27.

### B. Positions of the Parties

The plaintiffs have sued the United States for the role of the Secretary in approving the actions taken by the RAC, which are alleged to be a taking in violation of the plaintiffs' Fifth Amendment right to just compensation. The United States counters that this court does not have jurisdiction to hear the suit because the actions about which the plaintiffs complain were taken by the RAC, which as a NAFI, may not be sued in this court. The Tucker Act's grant of jurisdiction to the Court of Federal Claims over claims "against the United States founded either upon the Constitution, or any Act of Congress" is not unlimited. 28 U.S.C.

§ 1491(a)(1) (2003). Rather, the jurisdiction is constrained by the requirement that the court can only render judgment when the judgment will be paid out of funds that are part of the general federal appropriation. 28 U.S.C. § 2517 (2003). This requirement, in turn, has led to the limitation that "the Court of Federal Claims generally lacks jurisdiction over actions in which appropriated funds cannot be obligated." *Core Concepts*, 327 F.3d at 1334. According to the government, where, as here, the entity acting cannot obligate appropriated funds, this court cannot render a judgment without express congressional authorization. The government argues that Congress has not authorized the payment of judgments for actions taken by NAFIs established under the AMAA and thus this case must be dismissed.

The plaintiffs contend that the RAC is not a NAFI and so this court has jurisdiction over their claim under the Tucker Act. Second, the plaintiffs contend that the actions of the Secretary in approving the RAC's actions are sufficient to establish jurisdiction. Finally, the plaintiffs argue that their claim is based on the Fifth Amendment to the Constitution, which mandates compensation regardless of which government entity committed the acts in question.

## C. The RAC is a NAFI

■ As noted above, Congress has not granted jurisdiction to this court to award money damages for actions taken by NAFIs. 28 U.S.C. 1491(a)(1); *Core Concepts*, 327 F.3d at 1334. It is well settled that instrumentalities established pursuant to the AMAA are NAFIs. *Kyer*, 369 F.2d at 718[2]; *Lion Raisins, Inc. v. United States*, 57 Fed. Cl. 435, 437 (2003). The RAC is a NAFI because it cannot obligate money appropriated from the general federal revenue. *Core Concepts*, 327 F.3d at 1334. Rather, the RAC takes action with the money it receives from its members. *Kyer*, 369 F.2d at 719 (holding that the Secretary cannot be ordered to pay out money derived from private sources). The fact that the RAC received

some funds from the Secretary pursuant to the AMAA does not alter its status as a NAFI.

■ The AMAA sets out the limits for the permissible uses of appropriated sums for agencies created under Marketing Orders. The AMAA gives the Secretary the power to create Committees, called "agencies" in the statute, like the RAC. The AMAA restricts the funds available for the Committee and Secretary to spend to the levies paid by handlers, like the plaintiffs. 7 U.S.C. § 610(b)(2)(ii) (2003). Under the AMAA, the Secretary may use appropriated sums only for limited purposes, like to pay for activities effecting the correction of agricultural prices and the expansion of domestic or foreign markets. 7 U.S.C. § 608(3) (2003). Because the Secretary's discretion over how to use appropriated sums is limited, their use does not destroy the RAC's status as a NAFI. *Kyer*, 369 F.2d at 719. Similarly, the fact that § 612 of the AMAA also allows appropriated funds to be used for the administrative expenses of agencies created under the AMAA does not alter this result. An initial appropriation for limited uses does not destroy the status of an entity as a NAFI. *See Core Concepts*, 327 F.3d at 1335; *Furash*, 252 F.3d at 1341; *Kyer*, 369 F.2d at 718.

Indeed, the very same statute that created the RAC is the statute at issue in *Kyer*. 7 U.S.C. § 601 *et seq.*; 369 F.2d at 718. In *Kyer* the statute dictated that "each handler ... shall pay to any authority or agency established under such order such handler's pro rata share (as approved by the Secretary) of such expenses as the Secretary may find are reasonable ... for such purposes as the Secretary may, pursuant to such order, determine to be appropriate." 7 U.S.C. § 610(b)(2)(ii) (as quoted in *Kyer*, 369 F.2d at 718). From this, the relevant authorizing language, the Court of Claims could "perceive no basis for inferring that public funds might be used to pay" the sum which the plaintiff was claiming. *Kyer*, 369 F.2d at

---

2. This case dealt with the Grape Crush Administrative Committee ("GCAC"). The GCAC has been terminated by statute and so the direct holding of the case no longer applies. Nevertheless, the findings of the Court of Claims regarding the status of the GCAC, as an entity created under the AMAA, are unaffected by the change in law.

718. Accordingly, the Court of Claims dismissed the case. *Kyer*, 369 F.2d at 719.

The RAC, at issue here, is relevantly similar to the entity at issue in *Kyer* insofar as it is created under the same statute with the same powers and limitations. Thus, the court finds that the RAC is a NAFI.

## D. The Actions of the Secretary Do Not Create Jurisdiction in this Case.

 Perhaps realizing that the law on suits against NAFIs is rather settled, the plaintiffs next contend that they have invoked this court's jurisdiction by suing the Secretary directly for approving the actions of the RAC. Their claim is that the Secretary committed the taking by allowing, even authorizing, the RAC to use money properly owed to the plaintiffs. The plaintiffs contend that the Secretary is the United States for the purposes of the suit and so the NAFI doctrine does not apply. The United States counters, correctly, that the individual named in the suit does not change the nature of the action. In other words, so long as the NAFI was the party taking the action, it does not matter that the Secretary approved the action. At issue is not whether the suit is filed against the RAC or the Secretary, but rather whether the United States has agreed to be sued for the actions alleged.

The concept of the NAFI has developed specifically to shield the government from liability for money damages. As long as the acts of the NAFI are interposed between the Secretary and the plaintiff, the plaintiff cannot bypass the restrictions placed on this court's jurisdiction by suing the Secretary instead of the RAC. The alleged taking is alleged to be the act of the RAC, whether permitted or authorized by the Secretary. Since the alleged taking involves funds collected and dispersed by the NAFI, the NAFI doctrine applies to bar suit in this court. *See* 28 U.S.C. § 2517; *Core Concepts*, 327 F.3d at 1334.

The plaintiffs urge upon the court the argument that there is no logical distinction between the acts of the RAC in this case and a hypothetical order from the Secretary to a NAFI to confiscate the family homes of private individuals. This hypothetical is not before the court today. The case at bar involves only RAC funds and RAC members. The Secretary approved the decisions of the RAC with respect to the use of RAC-member funds merely by not objecting to resolutions that were passed by the RAC.

Furthermore, as sympathetic as a plaintiff's case may be, it does not create in this court the power to expand its jurisdiction beyond that which is granted to it by Congress. In this connection, it is important to note that Congress, upon perceiving that private parties contracting with NAFIs were sometimes left without a remedy for damages against the United States when the NAFI was in breach of contract, amended the Tucker Act in 1970 to include in this court's jurisdiction specific provision to pay for the liabilities of certain NAFIs. 28 U.S.C. § 1491(a)(1). The NAFIs for whose actions the United States would now be liable were limited, however, to the Armed Forces Exchanges and the Exchange Councils of NASA. 28 U.S.C. § 1491(a)(1). The intention of Congress was to except these particular NAFIs from the general rule that the United States is not responsible for the liabilities of NAFIs. H.R.Rep. No. 91–933, at 3 (1970), reprinted in 1970 U.S.C.A.A.N. 3477, 3479.

 The specific listing of a group of NAFIs in the 1970 amendment leads to the inference that all other NAFIs, like the RAC, were intended to be excluded. H.R.Rep. No. 91–933, at 3, 1970 U.S.C.A.A.N. at 3479; *Furash*, 252 F.3d at 1339. In construing the NAFI doctrine after the 1970 Tucker Act amendment, the Federal Circuit held that "Congress intended to leave the doctrine intact for all other non-appropriated fund instrumentalities." *Furash*, 252 F.3d at 1339. This type of construction is a specific instance of the general rule that "only an express statute may waive the sovereign immunity of the United States." *Taylor v. United States*, 303 F.3d 1357, 1361 (Fed.Cir.2002). As both the Supreme Court and the Court of Claims have recognized, despite the hardship created by the NAFI doctrine, "it is up to Congress to remedy this apparent harsh result ... [T]he court should refrain from legislating by judicial fiat."

*AINS*, 56 Fed.Cl. at 529 (internal citations omitted).[3]

Accordingly, absent express action by Congress allowing suits for money damages against NAFIs established under the AMAA, the suit must be dismissed. The fact that the Secretary has some role in approving the RAC's actions did not convert the actions of a NAFI into actions of the Secretary.

## E. The Self–Executing Nature of the Fifth Amendment does not Guarantee a Right to Monetary Relief.

██ Finally, the plaintiffs contend that, because the Fifth Amendment is self-executing, this court must have jurisdiction to hear their case. Plaintiffs rely on *Jacobs v. United States*, 290 U.S. 13, 16, 54 S.Ct. 26, 78 L.Ed. 142 (1933), for the proposition that this court has jurisdiction over their Fifth Amendment claim without regard to whether Congress has specifically provided for suits against NAFIs in the Tucker Act. The government correctly responds by distinguishing between the existence of a claim for money damages and the provision of a forum for hearing a case.

██ In essence, the plaintiffs argue that they are left without a remedy if the court finds that the Tucker does not extend to their suit. The principle that for every right there should be a remedy is oft-quoted and venerable. *See, e.g. Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 162–63, 2 L.Ed. 60 (1803). However, in practice this principle is constrained by the fact that it is Congress, not the courts, which determines what types of cases the federal courts may hear. *Hopkins*, 427 U.S. at 125, 96 S.Ct.

2508. As it stands, the United States has waived its immunity for some, but not all, of its acts. It is true that the Fifth Amendment is self-executing. However, this only means that there does not have to be separate statutory authority allowing for compensation, *if the court can otherwise hear the suit.* The Fifth Amendment itself does not provide a tribunal for every suit. This is evidenced by the fact that, prior to the Tucker Act, even with the Fifth Amendment in effect, the United States was not generally subject to suit; individuals claiming violations of the Fifth Amendment were relegated to seeking redress from Congress.[4] *Lion Raisins*, 57 Fed.Cl. at 438. Therefore, in order for this court to hear a Fifth Amendment claim, it must fit both within the Tucker Act and within the limitation placed on the court by 28 U.S.C. § 2517, which authorizes the payment of judgments only from appropriated funds. 28 U.S.C. § 2517.

As Judge Merow noted in *Lion Raisins*, before the 1970 Amendment to the Tucker Act no suits against NAFIs were allowed. *Lion Raisins*, 57 Fed.Cl. at 438. The 1970 Amendment waived the government's sovereign immunity for certain NAFIs. *Denkler v. United States*, 782 F.2d 1003, 1007 (1986). However, this amendment has had no effect on other NAFIs which are not listed in the amendment. From this, Judge Merow reasons that NAFIs have not benefitted from the general grant of jurisdiction of the Tucker Act for claims "founded ... upon the Constitution." 28 U.S.C. 1491(a)(1); *Lion Raisins*, 57 Fed.Cl. at 438. If NAFIs had so benefitted, the 1970 Amendment would have been unnecessary. As discussed above, in order for this court to find a grant of juris-

---

3. The seemingly harsh result created by the withholding of this court's jurisdiction is largely mitigated by the fact that plaintiffs *do* have a remedy, albeit not one in this court. The AMAA provides that handlers, like the plaintiffs in this case, may petition the Secretary for modification or exemption from an order which they believe is not in accordance with the law. 7 U.S.C. § 608c(15)(A) (2003). The Secretary then must give the petitioner an opportunity for a hearing after which the Secretary makes a ruling on the petition. 7 U.S.C. § 608c(15)(A). After a petitioner exhausts these administrative procedures, judicial review is allowed. *See e.g., Gallo Cattle Co. v. United States Dep't. of Agric.*, 159 F.3d 1194, 1197 (9th

Cir.1998). By statute, a petitioner is entitled to judicial review only in the United States District Courts. 7 U.S.C. § 608c(15)(B).

4. Before the passage of the Tucker Act, the United States could not generally be sued for money damages founded on a Fifth Amendment takings claim. *Property owners who claimed that their property was taken without just compensation had only one remedy: they could submit a private bill to Congress in the hopes that Congress would grant them relief. However, Congress had total discretion as to whether or not to pay for its action. Lion Raisins*, 57 Fed.Cl. at 438.

**398**

diction over suits against other NAFIs, like the RAC, Congress would first have to return to § 1491 and provide jurisdiction to hear those cases. 28 U.S.C. 1491(a)(1); *Lion Raisins,* 57 Fed.Cl. at 438.

This court adopts Judge Merow's reasoning and holds that the Tucker Act does not extend its general waiver of sovereign immunity to NAFIs like the RAC. When amending the Tucker Act in 1970, Congress had the opportunity to include all NAFIs, or all cases involving Fifth Amendment claims. However, Congress chose to limit its waiver of immunity for only the Armed Forces and NASA Exchanges. *Denkler,* 782 F.2d at 1007; H.R.Rep. No. 91–933, at 3, 1970 U.S.C.A.A.N. at 3479. The intent of Congress not to allow this court to hear cases against NAFIs like the RAC is determinative. The case must be dismissed for lack of jurisdiction.

## CONCLUSION

For all the reasons stated above, the court **GRANTS** the government's June 13, 2003 motion to dismiss. Accordingly, the clerk is directed to **DISMISS** plaintiffs' taking action for want of jurisdiction pursuant to RCFC 12(b)(1). Each party shall bear its own costs.