# United States Court of Appeals for the Federal Circuit

04-5027,-5037

LION RAISINS, INC., and LION BROS.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

James A. Moody, of Washington, DC, argued for plaintiffs-appellants. Of counsel on the brief was Brian C. Leighton, of Clovis, California.

Cristina C. Ashworth, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director and Mark A. Melnick, Assistant Director.

Appealed from: United States Court of Federal Claims

Judge Nancy B. Firestone

# United States Court of Appeals for the Federal Circuit

04-5027, -5037

LION RAISINS, INC., and LION BROS.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED: July 22, 2005

_____

Before BRYSON, LINN, and DYK, <u>Circuit Judges</u>.

DYK, <u>Circuit Judge</u>.

This is a consolidated appeal from two decisions of the Court of Federal Claims, <u>Lion Raisins, Inc. v. United States</u>, 58 Fed. Cl. 391 (2003) ("<u>Lion I</u>" or "the reserve pool case"), and <u>Lion Raisins, Inc. v. United States</u>, 57 Fed. Cl. 435 (2003) ("<u>Lion II</u>" or "the bins case"). In both cases, plaintiffs Lion Raisins, Inc. and Lion Brothers allege takings arising from actions undertaken by the Raisin Administrative Committee ("RAC"), a marketing agency created pursuant to the Agricultural Marketing Agreement Act of 1937, <u>as</u> <u>amended</u>, 7 U.S.C. § 601 <u>et seq.</u> ("AMAA" or "Act"). In each case, the Court of Federal Claims dismissed, holding that the non-appropriated fund instrumentality ("NAFI") doctrine barred the exercise of jurisdiction. We disagree, and hold that the

Court of Federal Claims has jurisdiction over takings claims against the United States based on the actions of the RAC, because the RAC is an agent of the United States.

We nonetheless affirm the dismissals. In the reserve pool case, we hold that the case must be dismissed because Lion has failed to allege a cognizable takings claim. With respect to the bins case, we hold that the takings claim may not be brought against the government because the statute provides for an administrative remedy and for judicial review in district court.

BACKGROUND

I

At the heart of this case is the administration of the AMAA. The AMAA was originally enacted during the Depression, with the objective of helping farmers obtain a fair value for their agricultural products. Pescosolido v. Block, 765 F.2d 827, 828 (9th Cir. 1985); 7 U.S.C. § 602 (2000). The Supreme Court has upheld the constitutionality of the AMAA. United States v. Rock Royal Coop., Inc., 307 U.S. 533 (1939). "The Act contemplates a cooperative venture among the Secretary, handlers, and producers the principal purposes of which are to raise the price of agricultural products and to establish an orderly system for marketing them." Block v. Cmty. Nutrition Inst., 467 U.S. 340, 346 (1984); see also Kyer v. United States, 369 F.2d 714, 716 (Ct. Cl. 1966), cert. denied, 387 U.S. 929 (1967).

The Act operates through the implementation of Marketing Orders, designed "to prevent over-production of agricultural products and excessive competition in marketing them, with price stabilization as the ultimate objective." Parker v. Brown, 317 U.S. 341, 368 (1943). The Act delegates authority to the Secretary of Agriculture ("the Secretary")

to issue marketing orders, upon request of the affected producers, regulating the sale and delivery of various commodities, including raisins, "in order to avoid unreasonable fluctuation in supplies and prices." Kyer, 369 F.2d at 716-17; 7 U.S.C. §§ 608c, 602(4) (2000).

Marketing orders must be approved by either two-thirds of the affected producers or by producers who market at least two-thirds of the volume of the commodity. 7 U.S.C. § 608c(9)(B). The AMAA restricts the marketing orders "to the smallest regional production areas . . . practicable." 7 U.S.C. § 608c(11). The Raisin Marketing Order, codified at Part 989 of Title 7 of the Code of Federal Regulations, was originally promulgated in 1960. Its applicable regional production area is the State of California. 7 C.F.R. § 989.4 (2005).

The statute authorizes the Secretary to delegate the responsibility of implementing marketing orders to marketing committees and to empower those committees to issue rules and regulations. 7 U.S.C. § 608c(7)(C)(i)-(iv). The RAC is the marketing committee charged with administering the Raisin Marketing Order. 7 C.F.R. § 989.35 (a) & (b). The 47 members of the RAC come from the raisin production industry (with one public member and one representative of the industry's collective bargaining association), and are appointed by the Secretary after industry nomination. Lion I, 58 Fed. Cl. at 393; 7 C.F.R. § 989.26.

The RAC employs its own staff. The RAC is funded by assessments paid by handlers; it receives no funding from Congress. Lion I, 58 Fed. Cl. at 393 (citing 7 C.F.R. § 989.79). In past cases, we have held that similar entities are non-appropriated funds instrumentalities, or NAFIs. See, e.g., Kyer, 369 F.2d at 718-19. The Raisin

Marketing Order provides that members of the RAC are "subject to removal or suspension by the Secretary, in his discretion, at any time. Every decision, determination, or other act of the committee shall be subject to the continuing right of the Secretary to disapprove of the same at any time. Upon such disapproval, the disapproved action of the committee shall be deemed null and void." 7 C.F.R. § 989.95 (2005).

The Raisin Marketing Order divides those involved in the raisin industry into two categories—handlers and producers. The Raisin Marketing Order applies directly only to handlers. Under the Act, handlers are "processors, associations of producers, and others engaged in the handling" of covered agricultural commodities. 7 U.S.C. § 608c(1). Handlers are bound by the marketing orders promulgated pursuant to the AMAA. Stark v. Wickard, 321 U.S. 288, 303 (1944). The government may obtain injunctive relief, civil penalties, and criminal penalties against handlers who fail to comply with the regulatory provisions of a marketing order. 7 U.S.C. §§ 608a(5), 608a(6), 608c(14); see also United States v. Ruzicka, 329 U.S. 287 (1946). Although producers are not directly bound by the statute, 7 U.S.C. § 608c(13)(B), under the specific terms of the Raisin Marketing Order, all persons seeking to market California raisins out-of-state are deemed handlers and must comply with the Order.[1]

The Raisin Marketing Order, like other fruit and vegetable orders established pursuant to the AMAA, seeks to stabilize producer returns by limiting the quantity of raisins sold by handlers in the domestic competitive market. 7 U.S.C. § 608c(6); see

---

[1] The Raisin Marketing Order's definition of handlers includes "any person who places, ships, or continues natural condition raisins in the current of commerce from within the area to any point outside thereof." 7 C.F.R. § 989.15(b) (2005).

also John H. Vetne, Federal Marketing Order Programs, in 1 <u>Agricultural Law</u> 75, 78 (John H. Davidson ed., 1981) (describing various marketing control methods permissible under the AMAA for fruit and vegetable orders). The Raisin Marketing Order uses a reserve pool mechanism, authorized under 7 U.S.C. § 608c(6)(E), wherein the RAC can designate a portion of the yearly raisin crop as "free-tonnage" for sale without restrictions, and the surplus or "reserve-tonnage" is withheld for sale in secondary, non-commercial markets. 7 C.F.R. §§ 989.54(d), 989.65 (2005); <u>see also</u> <u>Prune Bargaining Ass'n v. Butz</u>, 444 F. Supp. 785, 788-89 (N.D. Cal. 1975) (discussing a comparable reserve pooling mechanism under the California prune order). In accordance with its authority to administer the Order, the RAC issues regulations regarding, <u>inter alia</u>, whether a reserve should be established for the year; if so, the free and reserve percentages for each varietal type of raisin; and the procedures for governing management of the reserve raisins. <u>See, e.g.</u>, 7 C.F.R. §§ 989.54, 989.56(a), 989.56(e), 989.58, 989.79, 989.80 (2005). "By regulating the amount of raisins in this market, the RAC can, in effect, regulate the price at which raisins are sold domestically." <u>Lion I</u>, 58 Fed. Cl. at 394.

Free-tonnage raisins may be disposed of by the handler in any marketing channel. Producers receive immediate payment from handlers, at the field market price, for the free-tonnage raisins. The market price for the free-tonnage raisins, or the field price, is not set by the RAC, but is determined through a private bargaining process carried out between producers' and handlers' bargaining associations. Producers are not paid immediately for reserve raisins. Reserve-tonnage raisins are held by handlers for the account of the reserve pool, which is operated by the RAC. <u>Lion I</u>, 58 Fed. Cl. at

04-5027,-5037                                    5

394. Reserve raisins are sold, as authorized by the RAC, in non-competitive outlets, such as school lunch programs. Id.; 7 C.F.R. §§ 989.65-67. The statute provides for "the equitable distribution of the net return derived from the sale [of reserve pool raisins] among the persons beneficially interested therein." 7 U.S.C. § 608c(6)(E). The RAC is charged with selling the reserve raisins in a manner "intended to maxim[ize] producer returns and achieve maximum disposition of such raisins by the time reserve tonnage raisins from the subsequent crop year are available." 7 C.F.R. § 989.67(d)(1). Since the mid-1990's, the RAC has been using the reserve pool to support an industry export program that effectively blends down the cost of exported California raisins thereby allowing handlers to be price-competitive in export markets where prices are generally lower than the domestic market.

Producers thus receive payment for their raisins in two installments. At the time of sale, they receive the field market price for free-tonnage raisins. For the reserve-tonnage raisins, they receive a share of the reserve pool sales proceeds, net of costs. "Funds generated from reserve pool sales programs, net of costs, become the growers' equity and are disbursed directly to each producer of record for that crop." Raisin Administrative Committee, Analysis Report, 10 (2001).

The reserve raisins are not warehoused in any central location, but rather stored by handlers on their own premises, and are released for sale per the instructions of the RAC. The RAC provides handlers with RAC-owned bins, free of charge, for the storage of reserve raisins. If the RAC has insufficient bins to handle the reserve-tonnage, handlers utilize their own bins. The regulations provide that "[h]andlers shall be compensated for receiving, storing, fumigating, handling, and inspection of . . . reserve

raisins . . . held by them for the account of the committee." 7 C.F.R. § 989.66(f). The regulations are specific that handlers who use their own bins to store reserve raisins "shall be compensated for the use of such . . . bins. . . . The rate of compensation shall be . . . 20 cents per day, per bin, not to exceed a total of $10 per bin per year." 7 C.F.R. § 989.401(c).

## II

Both of the cases before us were brought by Lion in response to alleged takings arising from the operation of this regulatory scheme.[2] In light of the procedural posture of the cases, we must assume the well-pleaded facts of the operational complaints to be true. Leider v. United States, 301 F.3d 1290, 1293 (Fed. Cir. 2002); Merrick v. United States, 846 F.2d 725, 726 (Fed. Cir. 1988) (citing Miree v. DeKalb County, 433 U.S. 25, 27 n.2 (1977)).

In Lion I, the reserve pool case, Lion, in its capacity as a raisin producer and equity holder in the reserve pool, challenged the RAC's use of reserve pool proceeds from the 1997 crop year to subsidize raisin export programs for the two subsequent years. 58 Fed. Cl. at 391. Lion's original complaint had alleged both a breach of contract claim and a takings claim. Lion then filed an amended complaint, which replaced the breach of contract claim with a claim that the "the United States ha[d] violated the Act of Congress [7 U.S.C. § 608c] and the Marketing Order" and thus was liable to Lion for money damages of "a sum in excess of $1 million dollars." (Lion I, First

---

[2] Appellant, Lion Raisins, Inc., a plaintiff in both the bins case and the reserve pool case, is both a producer and a handler. Lion Brothers, the second appellant, is only a raisin producer, and participated as a plaintiff only in the reserve pool case. For convenience we refer to both entities as "Lion".

Am. Compl. at ¶ 21.) Subsequently, Lion voluntarily dismissed the first cause of action, leaving only the takings claim. Lion I, 58 Fed. Cl. at 393 n.1. The takings claim alleged that Lion was entitled to just compensation because the RAC, by using the 1997 reserve pool proceeds to finance export programs in subsequent crop years, had accomplished a taking of money from Lion's distributive share of the 1997 reserve pool equity. (Lion I, First Am. Compl. at ¶ 23.) In effect, Lion was claiming that the RAC charged a cost attributable to the 1998 and 1999 raisin crop to the 1997 crop and thereby improperly reduced the 1997 reserve pool.

In Lion II, the bins case, Lion, as a handler, originally asserted a breach of contract claim, alleging that the RAC had failed to reimburse Lion for several thousand bins belonging to Lion that Lion had used to handle reserve raisins on behalf of the RAC. Evidently in the course of shipping the reserve raisins pursuant to the RAC's instructions, several thousand bins left Lion's possession, and were not returned. Lion II, 57 Fed. Cl. at 436. Lion argued that reimbursement for the missing bins was required by the Bin Rental Agreement that had been executed between Lion and the RAC, pursuant to the Raisin Marketing Order. Apparently in order to avoid the jurisdictional bar presented by the NAFI doctrine that precludes the exercise of Tucker Act jurisdiction over contract claims against the United States based upon the contracting activities of NAFIs, Lion amended its complaint to allege a Fifth Amendment taking. Id. In its amended complaint, Lion alleged that several thousand of its storage bins had been taken without just compensation through the actions of the RAC. Id. Lion sought compensation from the United States, based on the cost of the missing bins, as well as a rental fee for the RAC's use of Lion's bins during the period in question. Id..

Additionally, Lion sought a refund of rental fees that Lion paid to the RAC for its use of RAC-owned bins during the relevant crop year, arguing that such fees would never have been incurred if the RAC had properly returned Lion's own bins. Id. at 437.

In both the reserve pool case and the bins cases, the Court of Federal Claims held that the NAFI doctrine barred jurisdiction over Lion's takings claims. Lion I, 58 Fed. Cl. at 397-98; Lion II, 57 Fed. Cl. at 437-39. Consistent with our predecessor court's decision in Kyer, 369 F.2d at 718-19, both cases held that the RAC was a NAFI. Lion I, 58 Fed. Cl. at 395-96; Lion II, 57 Fed. Cl. at 437. Lion's claims were rejected on the theory that the Tucker Act waiver of sovereign immunity does not extend to takings claims based on the actions of NAFIs. Lion I, 58 Fed. Cl. at 397-98; Lion II, 57 Fed. Cl. at 437-39. As discussed in greater detail below, the Court of Federal Claims reasoned that the NAFI doctrine "applies to bar suit in [the Court of Federal Claims] . . . absent express action by Congress allowing suits for money damages against NAFIs." Lion I, 58 Fed. Cl. at 396-97; see also Lion II, 57 Fed. Cl. at 437. In the reserve pool case, the Court of Federal Claims reasoned that "[s]ince the alleged taking involves funds collected and dispersed by the NAFI, the NAFI doctrine applies to bar suit in this court." Lion I, 58 Fed. Cl. at 396.

Lion timely appealed both decisions to this court, which were subsequently consolidated for purposes of appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). See Core Concepts of Fla., Inc. v. United States, 327 F.3d 1331, 1334 (Fed. Cir. 2003).

DISCUSSION

I

We first consider the issue of jurisdiction. We review without deference the dismissals of Lion's complaints for lack of jurisdiction. AINS, Inc. v. United States, 365 F.3d 1333, 1336 (Fed. Cir. 2004); Core Concepts, 327 F.3d at 1334.

The Tucker Act broadly provides jurisdiction for "any claim against the United States founded . . . upon the Constitution." 28 U.S.C. § 1491(a)(1) (2000). This includes on its face all takings claims against the United States. See Presault v. Interstate Commerce Comm'n, 494 U.S. 1, 11 (1990). As originally enacted, and today, the Tucker Act provides no exception to its general waiver of the United State's sovereign immunity for claims "founded upon the Constitution." "If a claim falls within the terms of the Tucker Act, the United States has presumptively consented to suit." United States v. Mitchell, 463 U.S. 206, 216 (1983). There is no question that the United States, in general, incurs takings liability for the acts of its agents. That is, a takings "claim against the United States" may be based on the acts of an agent of the United States.

The Supreme Court has held that if agents of the federal government accomplish takings of private property, "[t]he action of the agent is the act of the government" and it is the federal government that is liable for suit, not the agent. Yearsley v. W.A. Ross Constr. Co., 309 U.S. 18, 21-22 (1940) (citation and quotation marks omitted). In Yearsley, a private company, carrying out a government contract, built river dikes which destroyed privately-owned land. The property owners brought suit against the company, and the Supreme Court found that "if what was done was within the

constitutional power of Congress, there is no liability on the part of the contractor for executing its will." Id. at 20-21.  Because the government had "impliedly promised to pay [compensation for any taking] and has afforded a remedy for its recovery by a suit in the Court of Claims . . . there is no ground for holding its agent liable who is simply acting under the authority thus validly conferred."  Id. at 21-22.   Rather, the suit must be brought against the United States.

Thus, for example, when separate corporate entities act for the United States, the United States is liable for their takings.  See, e.g., Russian Volunteer Fleet v. United States, 282 U.S. 481, 489 (1931) (United States bound to pay just compensation when Shipping Board Emergency Fleet Corporation, acting under legislative authority, requisitioned contracts for the construction of two vessels); see also Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 440-41 (1982) (holding state government liable for a physical taking, even though the activity in question was carried out by a private cable company); Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1363 (Fed. Cir. 2002) (recognizing that the federal government may be held liable for takings that are consummated through its "alter ego or agent").

So too when state agencies act as agents of the United States, the United States may incur takings liability.  See Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1196 (Fed. Cir. 2004) (holding that attribution of "state-imposed restrictions to the federal government for purposes of the takings analysis . . . is proper . . . only if the state officials were acting as agents of the federal government or pursuant to federal authority"); B & G Enters. v. United States, 220 F.3d 1318, 1322 (Fed. Cir. 2000) (holding that the United States could be subject to suit in the Court of Federal Claims for

an alleged regulatory taking effected by the state of California only if California could be considered "an agent of the federal government"); Hendler v. United States, 952 F.2d 1364, 1378 (Fed. Cir. 1991) (recognizing that common law agency is a test for determining when takings accomplished by others are attributable to the federal government). In sum, the fact that the federal government acts through an agent in accomplishing a taking of private property "does not absolve it from the responsibility, and the consequences, of its actions." Toews v. United States, 376 F.3d 1371, 1381-82 (Fed. Cir. 2004) (quoting Preseault v. United States, 100 F.3d 1525, 1551 (Fed. Cir. 1996) (en banc) (plurality opinion)). "[T]he United States, having by its agents, proceeding under the authority of an act of [C]ongress, taken the property of the claimant for public use, are under an obligation, imposed by the [C]onstitution, to make compensation." United States v. Great Falls Mfg. Co., 112 U.S. 645, 656 (1884).

There is also no question that NAFIs are agents of the United States. The Supreme Court has repeatedly recognized that NAFIs are "arms of the government" deemed "essential for the performance of governmental functions." Standard Oil Co. v. Johnson, 316 U.S. 481, 485 (1942); United States v. Hopkins, 427 U.S. 123, 124 (1976); Army & Air Force Exch. Serv. v. Sheehan, 456 U.S. 728, 733 (1982).[3]

In Kyer, our predecessor court held that the now defunct Grape Crush Administrative Committee, established pursuant to a marketing order under the

---

[3]     For purposes of the Federal Tort Claims Act, NAFIs have also been held to be agencies of the federal government and thus able to subject the United States to liability for their actions. See, e.g., United States v. Holcombe, 277 F.2d 143, 146 (4th Cir. 1960) (holding that Officers' Mess at a naval base, a NAFI, was "an agency [and it is] difficult to escape the conclusion that the Federal Tort Claims Act encompasses it . . . [in] the absence of any restriction in the statute"); see also Bozeman v. United States,

authority of the AMAA, was a NAFI and that the court had no jurisdiction over claims for breach of the Committee's contracts, but in so holding, the court recognized that the Committee was "an agency of the United States, established and controlled by the Secretary of Agriculture pursuant to authority vested in him by the Agricultural Marketing Agreement Act of 1937." 369 F.2d at 715-16.[4] Indeed, the government in <u>Kyer</u> "affirm[ed] the Committee's status as an agency of the United State[s]." <u>Id.</u> at 717. Similarly, in oral argument in this case, the government confirmed that the RAC was an agent of the United States.

It would thus appear clear that takings claims based on the actions of NAFIs are "claims against the United States founded . . . upon the Constitution." As the Supreme Court recognized in <u>Preseault</u>, the "proper inquiry" in any challenge to the exercise of Tucker Act jurisdiction is "whether Congress ha[s] <u>withdrawn</u> the Tucker Act grant of jurisdiction . . . to hear a suit . . . founded . . . upon the Constitution." 494 U.S. at 11-12 (quoting <u>Reg'l Rail Reorganization Act Cases</u>, 419 U.S. 102, 126 (1974)) (emphasis in original) (internal quotations and alterations omitted). The government points to no language in the Tucker Act, or elsewhere, that reflects the requisite "unambiguous intention" to withdraw takings jurisdiction over claims against the United States based upon the actions of its agents. <u>Id.</u> at 12.

---

780 F.2d 198 (2d Cir. 1985) (holding that United States liablity for negligent acts of NAFI employee was barred by <u>Feres</u> doctrine and not discussing any other jurisdictional bar).

[4] The <u>Kyer</u> court rejected the argument that 7 U.S.C. § 612c, which provides for a general appropriation from the Treasury to the Secretary of Agriculture to fund administrative expenses of the Secretary incurred under the AMAA, constituted a source of appropriated funds available to the marketing committee sufficient to undermine the committee's NAFI status. 369 F.2d at 718-19. Lion's attempt to revive this already failed argument here is unavailing. The RAC is a NAFI.

The government, however, urges, and the Court of Federal Claims held, that NAFIs are different from other agents of the federal government, and that the Tucker Act provides no jurisdiction over takings claims against the United States based on actions by NAFIs. We disagree. A virtually identical contention was rejected by us in the context of a closely related jurisdictional provision of the Tucker Act, granting jurisdiction over "any claim against the United States founded . . . upon . . . any Act of Congress." 28 U.S.C. § 1491(a)(1). In El-Sheikh v. United States, 177 F.3d 1321 (Fed. Cir. 1999), a Fair Labor Standards Act suit was brought by a NAFI employee against the United States. The government argued that the NAFI doctrine applied to bar jurisdiction in the Court of Federal Claims. We disagreed, and held that there was no express NAFI limitation to the Tucker Act's grant of jurisdiction for "any claim against the United States founded . . . upon . . . any Act of Congress" and that the Tucker Act encompassed the NAFI employee's FLSA claim, because "[f]or purposes of the [FLSA], [the NAFI] employer is 'the government of the United States" and the FLSA was an "Act of Congress". Id. at 1323. [5]

---

[5]      To be sure, the Tucker Act grant of jurisdiction, and the corresponding waiver of sovereign immunity, is inapplicable if the money-mandating provision does not make the United States liable for the actions of NAFIs. Compare El-Sheikh, 177 F.3d 1321, 1325 (Fed. Cir. 1999) (FLSA makes United States liable for acts of NAFIs) with Taylor v. United States, 303 F.3d 1357, 1361 (Fed. Cir. 2002) (United States not liable to provide benefits to NAFI employees under the Separation Pay Act in light of the statutory command that any award of "separation pay shall be paid by an agency out of any funds or appropriations available for salaries and expenses of such agency") (citing 5 U.S.C. § 5597 note) and Interdent Corp. v. United States, 488 F.2d 1011 (Ct. Cl. 1973) (holding that 28 U.S.C. § 1498(a), creating United States liability for patent infringement, does not make United States liable for infringing activities of a NAFI). Here we have determined that the Takings Clause imposes liability on the United States for acts of NAFIs.

Even apart from El-Sheikh, we reject the government's contention that the Tucker Act's jurisdictional grant does not extend to claims against the United States for takings effected by NAFIs.

First, the government relies on a series of decisions of this court holding that jurisdiction under the Tucker Act is limited by the so-called NAFI doctrine. But, the authority on which the government relies does not support the proposition that the United States is exempt under the Tucker Act for takings claims.

The origins of the NAFI doctrine lie in Standard Oil. There, the Court ruled that the Army "post-exchanges" qualified for a federal government exemption from a California state tax. 316 U.S. at 484-85. The Court noted that the "post exchanges as now operated are arms of the government deemed by it essential for the performance of governmental functions," but that the "government assumes none of the financial obligations of the exchange." Id. at 485.

"Relying on the Court's observation in [Standard Oil] that the 'Government assumes none of the financial obligations' of military post exchanges, . . . the Court of Claims, in a series of decisions, . . . held that it could not entertain contract claims against nonappropriated fund instrumentalities." Sheehan, 456 U.S. at 734 n.4. See, e.g., Kyer, 369 F.2d at 718; G.L. Christian & Assocs. v. United States, 312 F.2d 418, 424-25 (Ct. Cl. 1963); Borden v. United States, 116 F. Supp. 873, 877 (Ct. Cl. 1953). In 1970, Congress amended the Tucker Act, and granted jurisdiction over contract claims against the United States for contract claims brought against the armed forces exchanges. See generally McDonald's Corp. v. United States, 926 F.2d 1126, 1129-31 (Fed. Cir. 1991) (discussing the 1970 amendments and their legislative history).

Following the decisions of our predecessor court, we have repeatedly held that the Tucker Act confers no jurisdiction over claims based on contracts made by NAFIs other than those contemplated in the 1970 amendments.[6] All of these cases apply "[t]he general rule . . . that the Court of Federal Claims lacks jurisdiction to grant judgment against the United States on a claim against a NAFI because the United States has not assumed the financial obligations of those entities by appropriating funds to them." El Sheikh, 177 F. 3d at 1324 (citing Hopkins, 427 U.S. at 127); see Lee v. United States, 124 F.3d 1291, 1294 (Fed. Cir. 1997). See, e.g., AINS, 365 F.3d at 1334 (no Tucker Act jurisdiction over breach of contract claim with respect to the United States Mint); Furash & Co. v. United States, 252 F.3d 1336, 1340 (Fed. Cir. 2001) (no Tucker Act jurisdiction over contract dispute with the Federal Housing Finance Board); Core Concepts, 327 F.3d at 1335 (same with respect to Federal Prison Industries).

The Supreme Court recognized the NAFI doctrine, and its applicability to the contracts context, in Hopkins, stating that "[t]he nonappropriated-fund status of the exchanges places them in a position whereby the Federal Government, absent special legislation, does not assume the obligations of those exchanges in the manner that contracts entered into by appropriated fund agencies are assumed." 427 U.S. at 127.

---

[6] 28 U.S.C. § 1491(a)(1) now reads, in its entirety:
The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

Even if the NAFI doctrine extends beyond the contract context, the government has not called our attention to any holding in the long line of NAFI cases that suggests that the NAFI doctrine extends to takings.

Second, the government contends that even if the decided cases do not directly preclude takings jurisdiction, the reasoning of those cases applies equally to takings claims. We again disagree. The contract cases rest directly on the language of the Tucker Act. The language of the Tucker Act provides, with respect to contract claims, that the jurisdiction of the Court of Federal Claims exists over any "claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The theory of the NAFI cases is that NAFIs are separate entities (although they are agents of the United States). Such separate entities may make contracts that bind the entities themselves, but the Tucker Act does not authorize suits against those entities. It authorizes suits only against the United States, and then only based on contracts "with the United States". A contract made by a separate entity is a contract with the United States, binding on the United States, only if the separate entity has the authority to obligate appropriated funds, or, as stated in Kyer, if "that contract [is] one which, in the contemplation of Congress, could obligate public monies." 369 F.2d at 718. NAFIs are not recipients of appropriated funds, and thus cannot contractually obligate the United States. This reasoning is reflected both in the Supreme Court cases and our cases. As originally set forth in Standard Oil, the "government assumes none of the financial obligations of the exchange." 316 U.S. at 485. And, "since the Government had assumed no liability for the entity's financial obligations it could not be said to have consented to a suit designed to vindicate such

04-5027,-5037                    17

obligations." Hopkins, 427 U.S. at 125; see also AINS, 365 F.3d at 1337 (citing Borden, 116 F. Supp. at 873; Pulaski Cab Co. v. United States, 157 F. Supp. 955 (1958); Kyer, 369 F.2d at 714). This reasoning simply has no application to takings claims, where the United States does have the responsibility for the actions of its agents.

Finally, the government contends that the language of the 1970 amendments to the Tucker Act shows that the Tucker Act does not extend to takings claims against the United States based on actions by NAFIs. Again we cannot agree.

Contrary to the government's argument, the text and history of the 1970 amendments do not in any way suggest that Congress intended to limit Tucker Act jurisdiction with respect to NAFIs outside the contracts context. In 1970, Congress amended the Tucker Act to "afford contractors a federal forum in which to sue NAFIs" by providing for jurisdiction over contract claims against the armed forces exchanges. Hopkins, 427 U.S. at 126. The amendments were explicitly and narrowly targeted to provide jurisdiction only over contract claims of "a specific category of military organizations funded by resale activities which rendered them solvent and therefore able to support an adverse judgment without risk to the general treasury." McDonald's Corp., 926 F.2d at 1132. The statute was amended in order to eliminate what had been perceived as an "inequitable loophole." Hopkins, 427 U.S. at 126. As amended, the Tucker Act included an additional sentence stating: "For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). At the same time that

Congress amended the Tucker Act, it also amended the Supplemental Appropriation Act, to require that the exchange "making the contract shall reimburse the Government for the amount paid by the Government."  Act of July 23, 1970, Pub. L. No. 91-350, 84 Stat. 449, codified at 31 U.S.C. § 1304(c) (2000).

The legislative history focuses on "post exchange types of operations," McDonald's Corp., 926 F.2d at 1132-33, or "peripheral military institutions, such as officers' clubs, post exchanges and ships' stores, which are considered by the courts to be instrumentalities of the United States and yet are not supported by appropriated funds," id. at 1130 (citations omitted).  The legislative history further reveals that an earlier, broader, version of the amendment extending the Tucker Act's waiver of sovereign immunity to suits against all NAFIs was similarly limited to the contracting context.  Id. at 1129 (noting that the original version of the Senate bill would have enacted "a waiver for all implied or express contracts with all NAFIs").  The waiver was narrowed to the military exchanges in order to ensure that any United States liability under the amendments would be limited to contracts made by NAFIs for which the federal government exercised "procurement control" and which were financially solvent, and thus able to reimburse the Treasury for any adverse judgments.  Id. at 1130-31.

Neither the text of the 1970 amendments, nor the legislative history, indicates that the amendments were intended to address anything beyond the limited question of which NAFIs would be able to subject the United States to suit based upon their contracting behavior.

In summary, we see no basis in the text of the Tucker Act itself; the legislative history of the 1970 amendments; or in the decisions of the Supreme Court or this court,

for limiting the scope of the jurisdictional grant over claims "against the United States . . . founded upon the Constitution" to exclude takings claims against the United States based on actions by NAFIs.[7] "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the Court of Claims to hear and determine." United States v. Causby, 328 U.S. 256, 267 (1946). The RAC is an agent of the United States, and the United States may properly be sued in the Court of Federal Claims for any takings that are allegedly consummated by the acts of its agent.[8]

## II

Even though the Court of Federal Claims dismissed both cases on jurisdictional grounds, we may consider whether the cases may be appropriately dismissed on any other legal grounds. As we have noted, "[a]n appellate court may affirm the [trial] court on a ground not selected by the [trial] judge so long as the record fairly supports such an alternative disposition of the issue." Banner v. United States, 238 F.3d 1348, 1355 (Fed. Cir. 2001) (internal quotation marks and citations omitted); see also U.S. Philips Corp. v. Sears Roebuck & Co., 55 F.3d 592, 597 (Fed. Cir. 1995). While this matter

---

[7] Contrary to the government's argument, there is nothing in the language of 28 U.S.C. § 2517(a) (2000) ("[E]very final judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefor") to suggest that the United States will not pay just compensation when held liable for a taking of public property by a NAFI. See, e.g., Hurley v. Kincaid, 285 U.S. 95, 103-04 (1932); United States v. Lynah, 188 U.S. 445, 465-66 (1903); Great Falls Mfg. Co. v. Att'y Gen., 124 U.S. 581, 599 (1888);

[8] In light of our conclusion that the RAC is an agent of the United States, we need not consider whether the Secretary's involvement in oversight of the RAC's activities is sufficient to implicate direct takings liability for the federal government. See, e.g., Casa de Cambio, 291 F.3d at 1361; see also Johanns v. Livestock Mktg. Assoc., 125 S.Ct. 2055 (2005), slip op. at 12 (May 23, 2005) (holding that advertising carried out by the Livestock Marketing Association, an entity similar in form and function to the RAC, is government speech in part because of the Secretary of Agriculture's oversight role over the challenged program).

was on appeal we directed the parties to submit supplemental briefs. Although the Court of Federal Claims was not barred from reviewing these claims due to the NAFI doctrine, we conclude that the dismissal of these actions should nonetheless be sustained.

With respect to both the reserve pool claim and the bins claim, the essence of the claims being asserted is that the RAC has either violated its statutory and regulatory obligations (in the reserve pool case) or failed to comply with its regulatory and contractual obligations (in the bins case). We conclude that these claims are not properly presented as takings challenges in the Court of Federal Claims, and instead must be pursued in the designated administrative and judicial fora.

We consider first the reserve pool issue. Here Lion asserts a claim as a producer with an interest in the 1997 reserve pool proceeds. Lion, both in the Court of Federal Claims and in this Court, has made clear that it does not challenge the overall operation of the regulatory scheme, including the requirement that growers contribute raisins to the reserve pool. (First Am. Compl. of Lion I, at ¶ 23; Br. of Appellant at 14; see also Appellant Supp'l Br. at 5 ("Neither case seeks a modification or exemption from the Raisin Order, nor a ruling that one of its provisions is unlawful."))

In its amended complaint, Lion alleged a first cause of action, charging a "Violation of an Act of Congress and Regulations Issued by the Secretary of USDA." The allegations of illegal agency action were incorporated wholesale into the takings claim (the second cause of action). Lion I, 58 Fed. Cl. at 393 n.1. Lion urged that the RAC's decision to use the 1997 reserve pool proceeds to fund the export program in

subsequent crop years constituted a taking because it was unlawful.[9]  Even after Lion voluntarily dismissed its first cause of action which alleged a "Violation of an Act of Congress and Regulations Issued by the Secretary of USDA," it continued to describe the "gist of the First Amended Complaint" (that is, the remaining takings claim) as a claim that "Plaintiffs were entitled to their equitable share of the 1997 reserve pool equity, as required by the Agricultural Marketing Agreement Act of 1937 (7 U.S.C. § 601 et seq. and the Raisin Marketing Order (7 C.F.R. § 989.1 et seq.))" and emphasized that it continued to rely on the "specific factual allegations contained in paragraph 21 of the first cause of action of the FAC (First Amended Complaint)," i.e., the allegations of illegality.[10]  (Pl. Opp. to Def. Motion to Dismiss Pl. First Am. Comp. at 2.)

---

[9] Lion also claimed that the change in the reserve pool benefit constituted a physical taking of the raisins themselves.  (Lion I, First Am. Compl. at ¶ 23.)  Of course, once the raisins were transferred to the RAC, Lion no longer had a property interest in the raisins themselves, but only in its share of the reserve pool proceeds as defined by the regulations.  7 C.F.R. § 989.66(h).

[10] Paragraph 21 of the First Amended Complaint, which is incorporated by reference into the takings claim, reads, in its entirety:

Title 7 C.F.R. § 989.66(h) specifically states that the net proceeds of reserve raisins sold into the various permissible markets must be distributed by the committee to the respective producers or their successor in interest thereto "on the basis of the volume of their respective contribution to the reserve tonnage of such varietal type."  An Act of Congress, 7 U.S.C. § 608c(6)(E) states that when the Secretary establishes reserve pools the Secretary must provide "for the equitable distribution of the net return derived from the sale thereof among the persons beneficially interested therein."  Neither the regulation nor the statute permits the RAC or USDA to allow the net proceeds to be used except to benefit the 1997 reserve pool equity holders such as Plaintiffs. The United States has violated the Act of Congress and the Marketing Order and thus is liable to the Plaintiffs in an amount according to proof, but a sum in excess of $1 million dollars not only to Plaintiffs as reserve equity holders, but as assignees or successors in interest to other producer's reserve equity.

We have made clear that a claim premised on a regulatory violation does not state a claim for a taking. In Rith Energy, Inc. v. United States, 247 F.3d 1355 (Fed. Cir. 2001) ("Rith I"), we took care to distinguish between the valid exercise of the Court of Federal Claim's jurisdiction over a takings claim when the claim was that "property was taken regardless of whether the agency acted consistently with its statutory and regulatory mandate" and the bar to such jurisdiction when "the plaintiff claims it is entitled to prevail because the agency acted in violation of statute or regulation." Id. at 1366 (emphases in original). "[T]o the extent that the plaintiff claims it is entitled to prevail because the agency acted in violation of statute or regulation, [our decisions do] not give the plaintiff a right to litigate that issue in a takings action rather than in the congressionally mandated administrative review proceeding." Id. (distinguishing Del-Rio Drilling Programs Inc. v. United States, 146 F.3d 1358 (Fed. Cir. 1998)) (emphasis in original). In our decision denying Rith's petition for rehearing, we clarified that "in a takings case we assume that the underlying governmental action was lawful." Rith Energy, Inc. v. United States, 270 F.3d 1347, 1352 (Fed. Cir. 2001) ("Rith II"). Because Lion's takings claim was premised on the allegations that the RAC violated the statute and regulations, the Court of Federal Claims properly dismissed the complaint.

We note that this is not a case in which the plaintiffs claim to have a contractual right in the maintenance of a particular calculation of net proceeds. If the party asserting the taking has contracted with the federal government, the contract itself may be a cognizable property interest that, if abrogated by legislation or regulatory action, may form the basis of a takings claim. See, e.g., Chancellor Manor v. United States,

---

(Lion I, First Am. Compl. at ¶ 21.) (emphasis added).

331 F.3d 891, 903 (Fed. Cir. 2003); <u>Cienega Gardens v. United States</u>, 331 F.3d 1319, 1330 (Fed. Cir. 2003). Here, however, Lion claims no contractual right to any specific compensation for its raisins. Indeed, Lion has formally abandoned a contract claim that was asserted in the original version of its complaint.[11]

III

We now turn to the bins case, which is asserted by Lion only in its capacity as a handler. To the extent that, as with the reserve claim, Lion is asserting that a taking has occurred because the RAC has violated the regulations, Lion has failed to state a claim.

But the complaint also appears to allege that Lion owned bins; that Lion transferred bins to the RAC; and that a taking occurred because the RAC appropriated the bins to its own use. To the extent that Lion contends that the United States has used the bins without payment, or retained the bins, the administrative and judicial review procedures available under 7 U.S.C. § 608c(15)(A) provide a remedy to recover the value of the rights alleged to be taken.

Section 608c(15) provides an administrative remedy to handlers wishing to challenge marketing orders under the AMAA; requires that the Secretary grant a

---

[11] Under the Supreme Court's decision in <u>Stark</u>, and its progeny, Lion was entitled to judicial review under the Administrative Procedure Act ("APA") as to whether the RAC violated the law by using a portion of the 1997 reserve pool to fund the export program for years other than 1997. 321 U.S. at 309-10; <u>Alto Dairy v. Veneman</u>, 336 F.3d 560, 563-64 (7th Cir. 2003); <u>United Dairymen v. Veneman</u>, 279 F.3d 1160, 1165 (9th Cir. 2002). Of course, no APA review is available in the Court of Federal Claims. See <u>Crocker v. United States</u>, 125 F.3d 1475, 1476 (Fed. Cir. 1997) (holding that the Court of Federal Claims lacked general federal question jurisdiction to review the propriety of agency action under the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (2000) and noting that the "Tucker Act does not create jurisdiction in the Court of Federal Claims for a party contesting the propriety of a taking") (citations omitted).

hearing and make a ruling on petitions brought by handlers; and vests the district courts with jurisdiction to review the Secretary's decision. It states:

> (A) Any handler subject to an order may file a written petition with the Secretary of Agriculture, stating that any such order or any provision of any such order or <u>any obligation imposed in connection therewith</u> is not in accordance with law and praying for a modification thereof or to be exempted therefrom. He shall thereupon be given an opportunity for a hearing upon such petition . . . . After such hearing, the Secretary shall make a ruling upon the prayer of such petition which shall be final, if in accordance with law.
>
> (B) The District Courts of the United States . . . <u>are vested with jurisdiction in equity to review such ruling</u> . . . . If the court determines that such ruling is not in accordance with law, it shall remand such proceedings to the Secretary with directions either (1) to make such ruling as the court shall determine to be in accordance with law, or (2) to take such further proceedings as, in its opinion, the law requires.

7 U.S.C. § 608c(15) (emphases added).

In <u>Ruzicka</u>, the Supreme Court observed that Congress, in this provision, "explicitly gave to an aggrieved handler an appropriate opportunity for the correction of errors or abuses by the agency" and held that any challenges to a marketing order could only be raised using the special statutory procedure provided by section 608c(15). 329 U.S. at 292-93. As the Court explained:

> Congress has provided a special procedure for ascertaining whether such an order is or is not in accordance with law. . . . And so Congress has provided that the remedy in the first instance must be sought from the Secretary of Agriculture. It is on the basis of his ruling, and of the elucidation that he would presumably give to his ruling, that resort may be had to the courts.

<u>Id.</u> at 294. Although Lion asserts that the statute concerns only court challenges to the legality of the marketing order, in fact, the section explicitly provides for challenges to "any obligation imposed in connection" with "any such order." The marketing order obligates handlers to store reserve tonnage raisins "separate and apart from other

raisins" and specifically refers to the use of "boxes and bins" for such storage. 7 C.F.R. §§ 989.66(b)(2) & 989.401(c). The RAC is obligated to compensate handlers for expenses incurred in "receiving, storing, fumigating, handling, and inspection of . . . reserve raisins . . . held by them for the account of the committee." 7 C.F.R. § 989.66(f). Lion alleges that it has not been compensated for the RAC's appropriation of its bins that occurred as a result of Lion's handling of reserve raisins. During oral argument, counsel for the United States acknowledged that Lion has an administrative remedy and may file a section 608c(15)(A) petition seeking redress for the RAC's alleged actions.[12]

Lion contends that the congressionally mandated administrative and judicial review procedures do not provide an adequate remedy because they do not provide for a monetary remedy. The statute vests district courts with jurisdiction in equity to review the administrative decisions of the Secretary under § 608c(15). The case law demonstrates that monetary relief, in the form of equitable restitution, may be awarded in the course of judicial review of section 608c(15)(A) proceedings. See Borden, Inc. v. Butz, 544 F.2d 312, 319 (7th Cir. 1976) (awarding restitution to handler for overpayments); Fairmont Foods Co. v Hardin, 442 F.2d 762, 773 (D.C. Cir. 1971) (same); see also Saulsbury Orchards and Almond Processing, Inc. v. Yeutter, 917 F.2d 1190, 1195 (9th Cir. 1990) (holding that "the district court, upon proper application can

---

[12]    Court:    "You say, speaking with the authority of the Secretary of Agriculture, that the Secretary reads this statute broadly enough to encompass claims of the sort involved in the bin case?"

Counsel:    "Yes, and the Secretary is currently reviewing such a case."

shape relief to protect the handler's rights in case any challenge to the marketing order is ultimately substantiated") (citation omitted).[13]

In short, as acknowledged by the government, Lion may challenge the RAC's actions with respect to the missing bins in the congressionally mandated review proceedings, and these proceedings are able to provide the full range of relief sought by Lion in the form of equitable restitution for the missing bins and any unjust enrichment on the part of the RAC resulting from its use of the bins without payment. Lion may not seek compensation in the Court of Federal Claims under the guise of a takings claim for what is essentially a challenge to invalid agency action.

We have repeatedly held that Tucker Act review of takings claims is precluded where Congress has provided "a specific and comprehensive scheme for administrative and judicial review." Vereda, Ltda. v. United States, 271 F.3d 1367, 1375 (Fed. Cir. 2001) (quoting St. Vincent's Med. Ctr. v. United States, 32 F.3d 548, 550 (Fed. Cir. 1994)); see also United States v. Fausto, 484 U.S. 439, 453-54 (1988) (holding that Civil Service Reform Act had a "comprehensive and integrated review scheme" for personnel matters that repealed by implication the judicial interpretation of the Back Pay Act which had previously served as a basis of Tucker Act jurisdiction); Tex. Peanut Farmers v. United States, 409 F.3d 1370 (Fed. Cir. 2005) (no Tucker Act jurisdiction over claim for breach of crop insurance contract, as Congress has granted district courts exclusive jurisdiction over claims against the Federal Crop Insurance Corporation

---

[13] Lion relies on In re Jet Farms, Inc., 50 Ag. Dec. 1373 (1991) in asserting that monetary relief is not available in section 608(c)15 cases, but that case stands for the proposition that monetary relief is only available in the form of equitable restitution, and that "[t]here is no authorization . . . for consequential damages." Id. at 1416.

in 7 U.S.C. §§ 1508(j) & 1506(d)); <u>Telecare Corp. v. Leavitt</u>, 409 F.3d 1345, 1348 (Fed. Cir. 2005) (noting our holding in <u>Wilson v. United States</u>, 405 F.3d 1002 (Fed. Cir. 2005), that Tucker Act jurisdiction over claims for Medicare benefits is withdrawn through "the specialized administrative and judicial review process" for such claims provided in the Social Security Act); <u>see also</u> <u>Massie v. United States</u>, 166 F.3d 1184, 1188 (Fed. Cir. 1999) ("[A] contract will not fall within the purview of the Tucker Act if Congress has placed jurisdiction over it elsewhere.").

For example, in <u>Vereda</u>, we concluded that the availability of complete administrative review by the DEA and subsequent judicial review in district court of the merits of a seizure and forfeiture of property in a drug forfeiture case under 21 U.S.C. § 881 precluded the exercise of jurisdiction in the Court of Federal Claims over the alleged taking. 271 F.3d at 1375. We noted that the availability of alternative review mechanisms for the challenged forfeiture, both administratively and before a district court, "evinces Congress' intent to preempt any Tucker Act jurisdiction over a money claim that challenges the propriety of an <u>in rem</u> administrative forfeiture of property seized under 21 U.S.C. § 881." <u>Id.</u> So here, the Court of Federal Claims is barred from exercising jurisdiction over the bins case given the availability of alternative review mechanisms for the challenged actions.

In summary, we affirm the Court of Federal Claims' dismissals of the two cases, albeit on different grounds. The reserve pool case is properly dismissed for failure to state a Fifth Amendment takings claim. The bins case is properly dismissed for lack of jurisdiction given the availability of an alternative administrative and judicial review procedure.

## CONCLUSION

For the foregoing reasons, the Court of Federal Claims' dismissals of Lion's actions are

<u>AFFIRMED</u>.

## COSTS

No costs.